389 So.2d 12 (1979)
STATE of Louisiana
v.
Elvin MYLES.
No. 63567.
Supreme Court of Louisiana.
June 25, 1979.
On Rehearing October 6, 1980.
*15 Lonny A. Myles, Hammond, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Duncan Kemp, III, Dist. Atty., Joseph Simpson, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
Mary E. Howell, Howell & Kellogg, Robert Altman, Visiting Atty., New Orleans, for amici curiae for Southern Prisoners' Defense Committee, Louisiana Coalition on Jails and Prisons, National Lawyers Guild, New Orleans Chapter, American Civil Liberties Union of Louisiana.
DIXON, Justice.
At about 4:45 p.m. on December 27, 1977 Elvin Myles entered Cilton's Department Store in Amite, Louisiana. After browsing for a short time, he grabbed the store clerk, sixty-eight year old Mrs. Lucille Erickson and ordered her to open the safe. When Mrs. Erickson replied that the safe could not be opened until the manager returned at 5:00 p.m., Myles forced her into a dressing room in the rear of the store and shot her twice in the head while she was seated on the toilet. He then emptied the cash register and took two coats and two sweaters. Mrs. Erickson was found a few minutes later by her sister and a neighbor, and died that evening.
Upon leaving the store, Myles met an acquaintance, Dexter Leonard, and explained the blood on his hands by telling Leonard that he had been caught shoplifting and had been shot by a store clerk. Leonard and Myles then went to Lorraine White's house trailer where Myles waited while Leonard secured a change of clothes for him and threw his old clothes into an abandoned van behind the trailer.
Later that evening Lorraine White and Natalie Lindsay drove Myles to Hammond to catch a bus to New Orleans. However, Myles changed his plans while waiting for the bus and decided to stay at a motel in Hammond for a few days. After Lorraine White rented a room for him at the Magnolia Inn, she drove with Natalie Lindsay and Jackie Hickerson to Arcola, Louisiana where Ms. Hickerson threw a paper bag containing the murder weapon into the river. The three women then went to Myles' room where he entertained them by relating the circumstances of the murder.
Myles was arrested on the following day and confessed to the crime in the late afternoon. He was indicted on January 4, 1978 for first degree murder in violation of R.S. 14:30. After a motion to suppress the confession was denied, the defendant was tried and convicted as charged on April 25, 1978. The jury thereafter found the presence of one aggravating circumstance, that the murder had been committed during the perpetration of an armed robbery, and consequently recommended that the defendant be sentenced to death. On May 11, 1978 Myles was sentenced by the court in accordance with the jury's recommendation.
The defendant now appeals his conviction and sentence, urging three assignments of error filed below.

Assignment of Error No. 1
The defense contends that the trial court was in error not to quash the indictment for the reason that the death penalty constitutes cruel and unusual punishment.
*16 The question whether the death penalty, itself, constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution has been resolved by the Supreme Court. In discussing this issue in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the court noted:
"Finally, we must consider whether the punishment of death is disproportionate in relation to the crime for which it is imposed. There is no question that death as a punishment is unique in its severity and irrevocability. Furman v. Georgia, supra, [408 U.S. 238] at 286-291, 92 S.Ct. [2726, at 2750-2753], 33 L.Ed.2d 346 (Brennan, J., concurring), [id., at] 306, 92 S.Ct. [2726, at 2760,] 33 L.Ed.2d 346 (Stewart, J., concurring). When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed. Powell v. Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, [65,] 77 L.Ed. 158, [84 A.L.R. 527] (1932); Reid v. Covert, 354 U.S. 1, 77, 77 S.Ct. 1222, [, 1262] 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring in [the] result). But we are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes." 428 U.S. at 186-187, 96 S.Ct. at 2931-2932, 49 L.Ed.2d at 882.
It is therefore clear that the death penalty does not violate the federal constitution.
Article 1, § 20 of the Louisiana Constitution prohibits cruel, excessive or unusual punishments. Although this court has not directly addressed the validity of the death penalty since the effective date of the 1974 Constitution, its validity has been an underlying premise in a number of cases in which we have reviewed its imposition. See State v. English, 367 So.2d 815 (La.1979); State v. Payton, 361 So.2d 866 (La.1978). Moreover, it is noteworthy that Article 1, § 22 provides for a mandatory jury trial in capital cases, an indication that the drafters did not intend to invalidate the death penalty by prohibiting cruel, excessive or unusual punishments.
This assignment of error lacks merit.

Assignment of Error No. 2
By this assignment of error the defense contends that the trial court erred in admitting a photograph of the victim because the picture's probative value was outweighed by its prejudicial effect. The picture to which the defendant objects is a low-contrast black and white study made at the morgue showing only the victim's head with a probe inserted in the two gunshot wounds. At trial the prosecution asserted that the picture tended to show intent to kill since the wounds were in the head. The trial judge stated in addition that the picture was admissible to corroborate the medical testimony and to show the nature and character of the wounds. The court also refused to admit a color photograph of the same scene.
The test of admissibility for allegedly gruesome pictures is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Matthews, 354 So.2d 552 (La.1978); State v. Lewis, 353 So.2d 703 (La.1977). Photographs of the deceased victim have generally been held relevant to prove the corpus delicti, to corroborate other evidence of the manner in which death occurred, to establish the location, number and severity of the wounds, and to establish the victim's identity. State v. Williams, 343 So.2d 1026 (La.1977).
In the instant case the photograph indicates where Mrs. Erickson was shot and was therefore relevant to establish the murder's occurrence, the manner in which it occurred, the number of wounds, and the victim's identity. On the other hand, the photograph itself is not particularly gruesome; no blood can be seen, and the bruises to the head allegedly caused by the defendant's beating of the victim are not observable. In light of the picture's significant probative value, the trial judge was correct to admit the photograph.
This assignment lacks merit.

*17 Assignment of Error No. 3

By this assignment the defense claims that Article 905.7 of the Code of Criminal Procedure is unconstitutionally vague and ambiguous because it leads the jury to believe that it must unanimously agree on the recommended sentence. In effect, the defense argues, the statute fails to inform the jury that the defendant will be sentenced to life imprisonment if the jury fails to make a unanimous sentencing recommendation.
Article 905.7 provides:
"The form of jury recommendation shall be as follows:
"Having found the below listed statutory aggravating circumstance or circumstances and, after consideration of the mitigating circumstances offered, the jury recommends that the defendant be sentenced to death.
Aggravating circumstance or circumstances found:
 s/______________
 Foreman'
or
"The jury unanimously recommends that the defendant be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence.
 s/______________
 Foreman'
The defense argument is based on an apparent confusion concerning the jury's role in the sentencing phase of the trial. Under the scheme provided in the Code of Criminal Procedure, the jury must unanimously agree on any sentence recommendation. C.Cr.P. 905.7. However, the jurors are not required to make a recommendation, and if they fail to reach an agreement, a sentence of life imprisonment will be imposed. C.Cr.P. 905.8. The trial judge explained this to the jurors in his charge: "... Before you decide that a sentence of death should be imposed, you must unanimously find beyond a reasonable doubt that at least one statutory aggravating circumstance exists. If you find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, you may consider imposing a sentence of death. If, however, you do not unanimously find beyond a reasonable doubt that any of the statutory aggravating circumstances existed, then life imprisonment without benefit of probation, parole or suspension of sentence is the only sentence that may be imposed. . . ."
The jurors were informed of only two possible recommendations and were instructed that any response other than a unanimous recommendation of death, coupled with a supported finding of an aggravating circumstance, would result in a sentence of life imprisonment. From this charge a reasonable juror could infer that failure to reach a unanimous sentence recommendation would result in life imprisonment.
This assignment of error lacks merit.
Several other alleged errors have been mentioned in an amicus curiae brief filed on behalf of the Southern Prisoners' Defense Committee, the Louisiana Coalition on Jails and Prisons, the National Lawyers Guild and the New Orleans Chapter of the American Civil Liberties Union. In this brief it is contended that the conviction and sentence should be reversed on one of several grounds.
The first error raised by the amicus brief concerns impermissibly prejudicial statements made by the prosecution during trial. In the opening statement the prosecutor asserted:
"Now, regardless of any verdict that you bring in, and if your verdict is subject to review, both as to guilt and as to sentence, by the Louisiana Supreme Court, this is only true in capital cases. It's the only case that the Louisiana Supreme Court can review the sentence as to whether it's correct or not. Of course, your verdict will also be subject to review in the United States Supreme Court. Therefore, although there's a heavy burden on you in a death sentence case, the burden is no heavier on you than it is on the prosecutor of the State of Louisiana or any of the other courts that have to review your verdict."
*18 It is contended that this statement, to which the defense did not object, encouraged the jury to take less than full responsibility for finding the defendant guilty and imposing the death penalty. Furthermore, reliance is placed on several cases in which allegedly similar arguments have resulted in reversals on appeal. Prevatte v. State, 233 Ga. 929, 214 S.E.2d 365 (1975); State v. Hawley, 229 N.C. 167, 48 S.E.2d 35 (1948); People v. Johnson, 284 N.Y. 182, 30 N.E.2d 465 (1940).
In Prevatte, the prosecuting attorney argued to the jury that the trial judge could disregard its recommendation and impose a life sentence, and that the appellate court could reverse the jury's decision to impose the death penalty. A similar inference was made to the jury in Hawley, where the prosecutor argued that the jury was only a small cog in the wheel of justice, and informed the jurors that their decision to convict for first degree murder would not necessarily result in the defendant's death due to the possibility of a reversal by a reviewing court or executive clemency. The district attorney in People v. Johnson on voir dire told the prospective jurors that their finding was not final because it was subject to review or could be overturned by executive clemency.
In the instant case, however, it is not apparent that the prosecutor's remarks were intended to encourage the jury to shirk its legal responsibility. The statements are essentially correct-this court reviews both the guilt and the sentence determination in capital cases, and a decision of this court is subject to review by the United States Supreme Court. Although the prosecutor stated that the burden was no heavier on the jury than on the State or the reviewing courts, the fair import of this statement was not to deprecate the jury's responsibility but instead was to express the shared responsibility of the components of the judicial system. The determination of guilt and recommendation of sentence, although onerous responsibilities, are not made in a vacuum-the prosecutor decides whom to prosecute and on what charges, and the appellate courts review the decisions reached by the jury. The prosecutor did not suggest that the jury's decision was any less important because it could be reversed by a higher court or overturned by executive clemency, but instead merely outlined the involvement of other components of the system. We therefore cannot agree that these remarks deprive Elvin Myles of a fair trial.
The amicus brief also alleges that reversible error was committed when the trial judge permitted the prosecutor to intimate in closing argument that a life sentence could possibly be shortened:
"When Mr. Myles makes the statement that he's never going to be back from a life imprisonment, the sentence is life imprisonment without benefit of probation and parole. Nobody can guarantee you that nobody can ever get probation or parole. There's no such thing as that."
The amicus brief places reliance on United States v. Williams, 523 F.2d 1203 (5th Cir. 1975), where reversible error was found in the prosecution argument that a verdict of not guilty by reason of insanity would result in the defendant's release. Here, however, the prosecutor did not allege that a life sentence would return the defendant to the streets, but merely stated the truth-no one can guarantee that a defendant sentenced to life imprisonment will never receive probation or parole. The defense could have objected to this statement and explained the great unlikelihood of the defendant's being paroled, but instead chose to ignore the argument apparently because it was little more than a rephrasing of the truism that nothing is certain. We therefore fail to see any substantial prejudice flowing from these remarks.
A second area of contention raised in the amicus curiae brief concerns the admissibility of the defendant's confession. The defense noted its objection to the trial judge's ruling denying the motion to suppress but did not raise the issue in brief to this court. The amici curiae argue that the statement should not have been admitted because Myles did not specifically waive his rights *19 but only stated that he understood them before he confessed to Officer Binder.
Before a confession may be admitted in evidence, the State must prove that the defendant was advised of his Miranda rights and that he knowingly and intelligently waived them. State v. Ross, 343 So.2d 722 (La.1977). Although the State bears a heavy burden of proving a waiver of these rights, waiver is to be determined by the facts of each case. State v. Alexander, 339 So.2d 818 (La.1976).
In the instant case, it is argued that the defendant's confession should have been suppressed because he only signed the statement of his rights and not the waiver form and because he merely stated that he understood his rights at the beginning of his confession. However, this court has indicated that a written waiver of rights is not a prerequisite to the introduction of a confession or other statement made while the defendant was detained. State v. Haynes, 339 So.2d 328 (La.1976); State v. Stevenson, 323 So.2d 762 (La. 1975). Moreover, in State v. Taylor, 336 So.2d 855 (La. 1976), we held that a waiver was implicit when the defendant was read his rights, stated that he understood them and then made a statement. See North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). In the present case Myles was read his rights and responded that he understood them each time he was asked. He then confessed to the crime. Under these circumstances, the trial judge's denial of the motion to suppress was not erroneous.
A third error raised in the amicus brief concerns the trial judge's failure to charge the jury that a life sentence could be imposed regardless of the evidence adduced during the penalty phase of the trial. The argument is not meritorious because this result was implicit in the judge's charge. The jury was not told that a recommendation of death had to be returned if one or more aggravating circumstances was found to be present. From this charge a reasonable jury could have easily inferred that the recommendation of life imprisonment did not require a basis in the evidence presented to it.
The amicus brief also contends that the trial court was in error not to require a complete record to be kept of all proceedings in this case. Listed as missing from the record are the transcripts of the change of venue hearing, the voir dire, the preliminary examination and the motion to suppress hearing.
The record does not indicate that the defense preserved any objection to the trial court's ruling on the motion to change venue, or that any dispute arose between the prosecution and defense during voir dire. The amicus brief alleges that it is impossible to develop the issue of local prejudice, and mentions the fact that the victim was related to a local law enforcement officer. However, with no showing of prejudice or any more specific allegation of prejudice than that presented in brief, their absence from the record cannot be considered reversible error.
The transcript of the preliminary hearing is also absent from the record, but it is significant that the preliminary hearing was conducted on March 16, 1978, more than two months after the defendant was indicted. At this time the defendant had no right to such a proceeding. La.Const. art. 1, § 14. Certainly the court's decision to conduct the hearing after the defendant had been indicted cannot be said to have produced prejudicial effects.
This court on its own motion requested that the record be supplemented with a transcript of the hearing on the motion to suppress, but the transcript of this hearing supports the trial judge's denial of the motion and offers the defendant no ground for relief. For these reasons, the deficiencies in the record do not present difficulties which compel a reversal.
The amici curiae also allege that the trial court erroneously instructed the jury concerning the definitions of first and second degree murder.
*20 In Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the United States Supreme Court held unconstitutional the Louisiana first degree murder statute because it lacked standards to guide the jury in selecting which first degree murderers should receive the death penalty. After the Roberts decision, the legislature redefined first and second degree murder and provided specific procedures to be followed in determining the sentence to be imposed for a capital offense. The legislature apparently followed the Georgia scheme as upheld in Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), to define first degree murder as a homicide committed with specific intent to kill or to inflict great bodily harm. The penalty for the crime is established as either death or life imprisonment without benefit of probation, parole or suspension of sentence. If a defendant is convicted of first degree murder, a sentencing hearing is conducted before the same jury, which must consider specific aggravating and mitigating factors in making its recommendation of sentence.
At the same time, the legislature redefined the lesser included offense of second degree murder as a homicide committed when the offender is perpetrating or attempting to perpetrate any of several enumerated felonies, even though he had no intent to kill. The penalty was set at life imprisonment without probation, parole or suspension of sentence for a period of forty years.
By Act 121 of 1977, the legislature added a second definition of second degree murder:
"The killing of a human being when the offender has a specific intent to kill, under circumstances that would be first degree murder under Article 30, but the killing is accomplished without any of the aggravating circumstances listed in Article 905.4 of the Louisiana Code of Criminal Procedure."
As this court recognized in State v. Payton, 361 So.2d 866 (La.1978), the legislature's definition of second degree murder as an unaggravated, specific intent killing operated as an implicit amendment to the first degree murder statute. Conduct covered by the second degree murder statute (intentional but unaggravated homicide) is obviously removed from the definition of first degree murder, and the latter offense is redefined as a specific intent killing accomplished with a statutorily prescribed aggravating circumstance. Payton also drew a distinction between those aggravating circumstances with which "the killing is accomplished" (C.Cr.P. 905.4(a), (b), (d) and (e)) and those which merely illustrate the offender's character and propensity (C.Cr.P. 905.4(c), (f) and (g)), and excluded the latter circumstances from the definition of first degree murder on state due process and fair trial grounds. See La.Const. art. 1, §§ 2, 13, 16. Therefore, the following delineation of offenses resulted [1] from this interpretation of the relevant statutes:
"The sum of the legislative and judicial action limits capital murder to specifically intended homicides committed in five situations: murder committed in the course of aggravated rape, aggravated kidnapping, aggravated burglary, armed robbery, or attempts to commit these crimes; murder of a fireman or peace officer engaged in his lawful duties; murder by which the offender knowingly created a risk of death or great bodily harm to more than one person; murder committed for remuneration; murder committed by a prison inmate while serving sentence for a felony. Any other specifically intended homicide constitutes second degree murder...." 361 So.2d at 872.
Elvin Myles was charged with the murder of Mrs. Lucille Erickson on December 27, 1977, a time falling between the *21 effective date of Act 121 of 1977 (September 9, 1977) and the date of our decision in State v. Payton, supra, (June 30, 1978). It is therefore clear that the presence of one of the aggravating circumstances approved in Payton was an essential element of the offense. The record demonstrates that the trial judge did not charge the jury to this effect, but instead read the first and second degree murder statutes as they were written, and then read the list of aggravating circumstances found in Article 905.4 of the Code of Criminal Procedure.
The aggravating circumstances were read as part of the definition of second degree murder; the jury was told that one definition of second degree murder was an intentional killing while the defendant was not guilty of any of the aggravating circumstances listed in C.Cr.P. 905.4.
The defense did not submit special charges or object to the trial court's instructions, and therefore did not preserve the issue for appeal. State v. Smith, 339 So.2d 829 (La.1976); State v. Craddock, 307 So.2d 342 (La.1975). Nevertheless, a review of the record is convincing that any error committed was harmless. The trial judge read the pertinent statutes as they were written, and it is not contended that the first degree murder statute as it then read was unconstitutional. The only deficiencies in the trial judge's charge stemmed from his failure to anticipate the decision of this court in State v. Payton, supra. Although the trial judge mentioned the three aggravating circumstances which Payton held could not constitutionally be made elements of the crime of first degree murder when he read the provisions of Article 905.4, the prosecution did not attempt to adduce evidence to prove any of these circumstances during the guilt phase of the trial (evidence to establish the heinous character of the offense was properly admitted during the trial's sentencing phase). For these reasons, the instructions given by the trial judge do not constitute grounds for the reversal of the defendant's conviction and sentence.
A final argument offered by the amici curiae alleges that the defendant was denied the effective assistance of counsel at trial and that he should therefore be granted a new trial.
The amicus brief first contends that the defense attorney appeared to have no articulable strategy and permitted the prosecution to dominate the proceedings. There is no suggestion of what strategy might have been effective, or what steps defense counsel might have taken to prevent the prosecution from presenting its evidence. A defendant in a criminal prosecution has a constitutional right not to testify, and this right is frequently exercised. In some cases, an acquittal is perhaps more easily obtained if a defendant with a criminal record remains silent rather than take the stand and open the door to impeachment by his past convictions. The determination of the defense to remain silent does not in itself constitute ineffective assistance, and nothing in the record indicates that counsel's silence substantially impaired the defendant's right to a fair trial.
Ineffective assistance is also allegedly demonstrated by the defense attorney's failure to request a bill of particulars. However, the amicus brief does not explain how the absence of a bill of particulars prejudiced the defense. The defense was aware of the charges against Myles and had a copy of his confession and of the test results conducted on the physical evidence; the prosecution's theory of the case was evident. Moreover, defense counsel quite actively filed other pretrial motions.[2] The failure to move for a bill of particulars did not render counsel's assistance ineffective.
*22 It is also asserted that the defense attorney made no independent investigation of the case and conducted a limited cross-examination of prosecution witnesses. Again, there is no suggestion of what exculpatory evidence an independent investigation of the crime might have unearthed. The evidence against Myles was overwhelming: blood on his clothes matched the victim's blood type; articles of clothing which Myles gave to friends soon after the murder were identified as merchandise by the owner of Cilton's Department Store; the defendant's gun was found where it had been hidden by his friends, and ballistics tests demonstrated that one bullet taken from the victim's brain had been fired from Myles' pistol; the defendant's confession to the crime was introduced at trial; and a friend who had heard Myles boast about the killing testified against him.
The allegation that defense counsel's cross-examination of prosecution witnesses was inadequate is also exaggerated. The defense did not examine all the State witnesses, but those who were not questioned testified to matters which were largely not in dispute. Defense counsel did cross-examine the prosecution witnesses who presented the most damaging testimony against Myles. This allegation is therefore lacking in merit.
A further allegation is that the defense attorney in closing argument conceded Myles' guilt and the accuracy and voluntariness of his confession. The amicus brief concedes that such tactics can pave the way for a successful defense argument, but argues that defense counsel never presented the jury a theory under which a verdict other than guilty of first degree murder could be returned. However, a review of the record is convincing that defense counsel attempted in closing argument to persuade the jury that Myles was more probably guilty of second degree murder because the requisite specific intent for first degree murder was missing. The closing argument does not demonstrate ineffective assistance of counsel.
Finally, the amicus brief contends that the defendant was denied the effective assistance of counsel at the sentencing hearing because his attorney admitted one aggravating factor, failed to present any evidence, and as a mitigating circumstance argued only that Myles had cooperated with the authorities by admitting his crime.
The entire argument of defense counsel follows:
"CLOSING ARGUMENT BY MR. MYLES:
"The State relies on the idea that there was an armed robbery in this case, for one, aggravating circumstance, and we can't deny it was there. We also can't deny that this charge is still pending. That means it hasn't been tried yet. There are two separate bills of information in this case, two indictments, that is. One is an armed robbery, one is a first degree murder. That is still a separate incident to this, a separate trial to this. At the idea of whether it was especially atrocious or cruel manner in which this murder was done. There was a murder done and nobody denies that. Dr. Evans didn't mention murder. When he was on the stand he never said it was especially atrocious, especially cruel. Any murder is cruel. Especially cruel means done in some, I would think, highly unusual way. There was some testimony from Dr. Genovese that she was beaten. There was never any testimony that she was beaten severely. Some contusions, the hemotoma, the small scrapes on her arm. Look at the words `especially atrocious and cruel.' I think that sets it apart from a murder. A murder is a murder. It's not good, it's cruel, it's atrocious. The foreign word is `especially atrocious.' When you look down at the mitigating circumstances, you always have to look under number H, whether there's any relevant mitigating circumstances. In a case like this and you having to decide on capital punishment or life imprisonment, he's never going to be back from life imprisonment, or you're going to put him in the electric chair. Bo Myles made a statement. You have to determine that *23 there's-he's really no good to be on this earth. He made a statement. The law will-it hasn't come out but the Judge will inform you that you can't plead guilty to first degree murder. He made a statement. He admitted that he did it. I would have to classify that as a mitigating circumstance. He never lied to you. Everything that's on the statement, he told the truth. That's all."
The amici curiae contend that the defense attorney was remiss in failing to inform the jury of the defendant's traumatic childhood experience, including his mother's death at his father's hand when Myles was two years old. The amicus brief also asserts that Myles was on drugs at the time of the offense, a mitigating circumstance provided in Article 905.5 of the Code of Criminal Procedure, but the only support for this allegation in the record is Myles' statement that he spent some of the money obtained in the robbery on preludin.
The duty of defense counsel to assist his client in a first degree murder prosecution does not terminate with a determination of guilt; certainly a defendant who faces death deserves a vigorous advocacy of his cause. See Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Here the defense attorney failed to mention his client's traumatic background or the possibility that he had acted under the influence of drugs when he committed the crime. On the other hand, defense counsel admitted the existence of one aggravating circumstance, the commission of the murder during an armed robbery.
Nevertheless, defense counsel's argument, although leaving much to be desired, does not fall to such a level of incompetence as to deny Myles the effective assistance of counsel. Although defense counsel admitted the existence of the armed robbery, the jury was obviously aware that it had occurred merely from listening to the evidence put forward during the guilt phase of the trial. Failing to mention the defendant's possible drug use at the time of the offense was a matter within the attorney's discretion, since Myles' statement could also be interpreted as a decision to celebrate Mrs. Erickson's death by purchasing drugs. Even failing to inform the jury of the defendant's unfortunate origins and environment is best considered a tactical choice. It was not unreasonable for counsel to decide that knowledge of defendant's background would have made the death sentence more likely. For these reasons, the defense attorney's representation of Myles did not fall beneath the constitutional standard of effective representation.

Capital Sentence Review
Article 905.9 of the Code of Criminal Procedure requires this court to "review every sentence of death to determine if it is excessive." An initial step in this determination is to consider the factual basis for the jury's recommendation of the death penalty which must be based upon a finding that one of the aggravating circumstances listed in Article 905.4 existed. The record reveals that the jury found one aggravating circumstance to exist:
"(a) The offender was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery."
The evidence introduced at both stages of the bifurcated proceeding clearly supports this conclusion. Myles explained the blood on his hands to Dexter Leonard by telling him that he had been caught shoplifting and had been shot by the store clerk. Leonard later saw Myles give away some articles of clothing and then burn a check made to the order of Cilton's Department Store. The owner of Cilton's identified as part of his stock some clothes which Myles gave to his friends shortly after the murder. In his confession, the defendant stated that he had been shopping in Cilton's when a sudden urge to rob the store overcame him and that he therefore proceeded to take certain goods after he had killed Mrs. Erickson. There is ample support for the jury's finding that this aggravating circumstance existed.
Section 3 of Rule 28 of this court requires the trial judge to complete and file a Uniform *24 Capital Sentence Report whenever the death penalty is imposed. From this report it appears that Elvin "Bo" Myles is a black male who was twenty-five years old at the time of the offense. When he was eighteen months old, his father killed his mother and Myles was chiefly raised by his uncle in the area around Rosedale, Louisiana. Myles attended only eight years of school and his ability to read, spell and perform mathematical functions is that of a fourth or fifth grader. Myles was given an IQ test when he was first sent to Angola in 1969, and the result was 99, well within the range of normal intelligence. Myles has no mental or physical deficiencies; when examined to determine whether he was capable of proceeding to trial, both physicians found him to be reasonably intelligent and in touch with reality. The defendant has never married and has no dependents.
Myles has had little job experience since the bulk of his adult life has been spent in correctional institutions; at the time of the murder he was unemployed. On the other hand, his criminal record is extensive and indicates that he was first sentenced at the age of sixteen to seven and one-half years in the state penitentiary for attempted aggravated rape. The prison conduct report indicates that Myles frequently failed to obey orders and often engaged in fighting. Since his discharge on May 1, 1974 he has been convicted twice for shoplifting and once for shoplifting, resisting arrest and threatening the life of a store employee. In October, 1975 the defendant received a six month sentence in parish jail for unauthorized use of a movable. Within a month of his release, he was convicted of disturbing the peace. Before the instant offense, Myles' most recent brush with the law occurred when he was convicted of five counts of resisting an officer and of two counts of simple battery.
The information contained in the report does not indicate the presence of any of the mitigating circumstances listed in Article 905.5 of the Code of Criminal Procedure. Myles has a significant past criminal history. There is no indication that the murder was committed while Myles was under another's domination or under the influence of a mental or emotional disturbance. Any belief on the defendant's part that his actions were morally justified was not communicated to the jury. The amicus brief, as noted earlier in the opinion, suggests that Myles was under the influence of drugs at the time of the offense, but nothing in the record supports this allegation. Finally, Myles had no accomplice, and is fully responsible for his actions.
Rule 28, § 4 requires the prosecution to include a synopsis of each first degree murder case in the district where the sentence was imposed. The only other death sentence in the past ten years from this district was imposed upon a white man who hired a third person to kill another white man. This court affirmed the conviction but reversed the sentence because the mandatory penalty which R.S. 14:30 then provided had been declared unconstitutional. State v. Forrest, 356 So.2d 945 (La.1978). The trial judge indicated in the Uniform Capital Sentence Report that he considered the instant crime the more aggravated of the two.
We find the record supports the jury's recommendation of the death penalty. There is no suggestion that the verdict was a result of passion, prejudice or other arbitrary factors.
For the reasons assigned, the conviction and sentence of Elvin Myles are affirmed.
CALOGERO, J., concurs and assigns reasons.
TATE, J., dissents and assigns written reasons.
DENNIS, J., dissents for the reasons assigned by TATE, J.
CALOGERO, Justice, concurring.
I concur.
On the only issues which are before this Court on this appeal I agree that defendant's conviction and sentence should be affirmed. I concur, rather than subscribe fully to the majority opinion, because I deem it unnecessary and inadvisable at this time on *25 the state of this record to determine affirmatively that defendant was not denied constitutionally effective assistance of counsel at trial.
That issue is not raised by defendant on this appeal. Rather it is presented by amici curiae.
Because I would not resolve that issue here does not suggest that I consider the contention meritorious, nor for that matter non-meritorious. I simply believe that proper determination on this serious constitutional issue should await the occasion when it is raised by defendant and when, should he make out a sufficient showing to warrant an evidentiary hearing, the contention might be examined on evidence beyond simply the present record in this case.
Should the defendant, in proper person or otherwise, raise this constitutional issue it would be appropriate in my view at that time to appoint a different attorney to represent him concerning it.
Affirming a conviction and reserving a defendant's right to raise constitutional issues not clearly established by the record by writ of habeas corpus is a procedure that this Court has repeatedly followed in non-capital cases. State v. Barnes, 365 So.2d 1282 (La. 1978); State v. Collins, 350 So.2d 590 (La. 1977); State v. Anthony, 347 So.2d 483 (La. 1977); State v. Daniels, 346 So.2d 672 (La. 1977); State v. Ross, 343 So.2d 722 (La. 1977); State v. Marcell, 320 So.2d 195 (La. 1975). I see no reason why it should be otherwise in a capital case. Until defendant himself complains that his lawyer's representation was so inadequate as to violate his constitutional rights I would not insist upon attempting to resolve that issue.
TATE, Justice, dissenting.
I respectfully dissent.
The state and federal constitutions do not forbid, as excessive, the imposition of the death penalty for intentional homicides committed in aggravated circumstances, provided there is careful consideration by the trier of fact and by independent appellate review, after weighing circumstances of the crime and of the particular individual which may indicate that life imprisonment rather than execution is appropriate. See Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) and State v. Sonnier, 379 So.2d 1336 (our docket no. 63,293, rendered this date).
As Proffitt and the United States Supreme Court decisions hold, a death penalty is permissible only where statutory circumstances narrowly define the aggravating circumstances which permit society to exact this ultimate penalty, and where the aggravating circumstances are not balanced or outweighed by circumstances pertaining to the accused or the crime which mitigate the intentional and vicious nature of the homicide.
Under the record before us, I would not be prepared to say, on the independent appellate review of the excessiveness of the sentence constitutionally required of us, that the death penalty here imposed was excessive, in the light of the aggravating circumstances of the crime and of the lack of (shown) mitigating circumstances insofar as the accused is concerned.
What the state and federal constitutions do prohibit, however, is the imposition of this penalty when the accused has not had the effective representation of counsel-at the trial on the merits, and also at the capital sentence hearing and upon appeal.
The record before us reflects what seems to be gross deficiencies in the representation by counsel required in capital cases before we may say that the death penalty was not excessively applied against this particular accused.
I do not mean to impugn the integrity or sincerity of the local public defender's office in its representation. Overworked and underpaid and underfinanced, beset by volume, it is perhaps pragmatically understandable that this office might not be in a position to divert great quantities of its limited time and resources to present a more extended defense of an extremely unpopular accused in the trial of a crime properly arising great public indignation.
*26 Nevertheless, however much we can understand and excuse the relatively low priority accorded the accused's representation in this instance, constitutionally we cannot excuse the judicial system's failure to afford more adequate representation in this case.
First, perhaps, I should note some of the obvious inadequacies.
After the accused was convicted of the vicious crime, in the sentencing hearing no defense was presented by way of any mitigating evidence, nor any opening argument made against imposition of the death sentence. (A brief filed by amicus curiae lists some mitigating circumstances reflected by the capital-sentence report, which should at least have been submitted to the jury for consideration in its awesome responsibility of recommending death instead of life imprisonment. The brief thus suggests that not even cursory preparation was made to develop for the jury factual circumstances which might militate against imposition of the ultimate penalty).
In the brief (4-pages of text) filed in this court by the indigent accused's appointed counsel, no argument is made that the death penalty is excessive under the circumstances. The 10-line paragraph concerning this issue contents itself with the argument that "the State no more has the right to deprive him of his life than to deprive other persons such as persons committed to state hospitals of their lives simply because they are no longer productive to our society." (Whatever the philosophical merit of the observation, the obliquely-raised constitutional issue has been decided adversely to the concept that the death penalty per se is unconstitutional). On the appeal, only three patently insubstantial assignments of error were urged and argued by brief and orally.
The trial on the merits was marked by its brevity of cross-examination on the part of the defendant's counsel.[1] While this might be understandable trial strategy if counsel was in effect saving his major efforts for the sentencing hearing in order to avoid the death penalty, as noted above no such effort whatsoever was made.
The defense counsel did not preserve any objection to the court's action (or inaction, there was apparently no ruling made) on the defendant's motion to change the venue. Nor was the voir dire examination recorded so as to disclose efforts by the defense counsel to ascertain the depth of public knowledge of this vicious crime, which included the murder of the victim who was related to a local law enforcement officer. The majority merely notes that "with no showing of prejudice or any more specific allegations of prejudice than that presented in [amicus curiae] brief, their absence from the record cannot be considered reversible error." Considering that a death penalty might not have resulted if the trial had been held in a forum sitting in a less indignant forum, this is just one of the numerous indicia of a less than forceful presentation of issues which is below the standard we have come to expect in capital cases.
The motion to suppress certain incriminating evidence was overruled, and no assignment of error was made as to this ruling. The majority sua sponte ordered up the record, and (without benefit of briefing or argument) has decided that the trial court ruling was correct. I do not mean to suggest that counsel should have assigned the denial of the motion as error, if it was truly unarguable; however, I can only say that it *27 is rare that the issue is not raised and argued in appeals concerning serious crimes.
The majority admits that counsel's efforts to avoid the death penalty left "much to be desired," but it apparently states that on the basis of the (extremely limited) record before us, the representation did "not fall to such a level of incompetence as to deny Myles the effective assistance of counsel." Without the benefit of any evidentiary showing-such as to whether it was a conscious tactical strategy not to develop mitigating evidence, rather than a failure to do so through lack of legal resources, preparation, or interest, the majority indicates that such might not have an unreasonable tactical choice.
An amicus curiae brief has been filed by five organizations who learned of the circumstances of the accused's trial after he was sentenced to death. They point out numerous apparent or possible deficiencies in the trial and sentencing representation. They suggest that, due to numerous hiatuses in the record, an evidentiary hearing is necessary to develop the full range of shortcomings in the representation provided appellant, noting that even from the limited record before us the accused did not (absent some explanation of the reasons for the apparent deficiencies) receive a trial at which he received effective legal representation.
Before this conviction and sentence is affirmed, such an evidentiary hearing should be held, and I respectfully dissent from the majority's failure to take this action. On the face of the present record, the indigent received far less forceful a defense than one which would have been accorded a person of means. It is virtually certain that post-conviction hearings will be necessary, through which a new trial will probably be afforded unless the present showing is substantially controverted.
The American system of justice permits society's revenge through the death penalty for vicious crimes committed by evil persons. At the same time, the American system of justice demands a full and fair hearing before this ultimate penalty is exacted, at which the trial jury and the appellate court may fully consider circumstances applicable to this individual which may mitigate against the imposition of this ultimate penalty.
On the record before us, this accused did not receive the hearing based upon all mitigating circumstances, with effective legal representation, to which every individual under American law is entitled, however vicious the crime and however evil the accused may be. Unless we regard a "trial" as merely a ceremonial preliminary to exacting revenge from socially despised individuals, as do the revolutionary tribunals in present-day revolutionary Iran, there should be in this case an evidentiary hearing to determine whether the present accused received the trial and legal representation to which he is entitled under the American and Louisiana constitutions-as he has not, insofar as the abbreviated record before us discloses.
I therefore respectfully dissent from the majority's failure to order such evidentiary hearing, in order that we may consider whether the accused's trial and legal representation met the constitutional standards required in capital cases, before we reach the issue of affirming the conviction and sentence.

ON REHEARING
DENNIS, Justice.[*]
We granted defendant's application for a rehearing in order to review whether the imposition of the death sentence can stand in light of defendant's contention that he received inadequate assistance of counsel at the sentencing hearing.[**] We reverse defendant's *28 death sentence and remand the case for a new sentencing hearing at which he shall be represented by different counsel. A person convicted of an offense punishable by death is entitled at his sentencing hearing to the reasonably competent assistance of an attorney acting as a diligent, conscientious advocate for his life. The defense attorney's efforts during the penalty phase of the bifurcated trial in the present case fell below the minimum constitutional standard applicable in a capital case.
At the sentencing hearing the prosecuting attorney made an opening statement to the jury that the state would prove beyond a reasonable doubt that the murder was committed under two aggravating circumstances, viz., the offender was engaged in the perpetration of armed robbery; and the offense was committed in an especially heinous, atrocious or cruel manner. The prosecutor further informed the jury that proof of one aggravating circumstance "[a]ccording to the law [is] all I'll require." Defense counsel did not object to the prosecutor's statement.
Defense counsel waived his client's right to make an opening statement.
The prosecuting attorney introduced the entire record of the trial on the issue of guilt, including the testimony of all witnesses, opening statement, exhibits, closing arguments, and verdict and rested.
Defense counsel rested his client's case without introducing any evidence.
In his closing argument, the prosecuting attorney simply asked the jury to impose the death penalty based on the evidence at trial on the issue of guilt, that at the time of the murder the defendant was engaged in armed robbery, and that the crime was committed in an especially heinous, atrocious or cruel manner.
Defense counsel's closing argument consisted of a very brief statement in which he conceded Myles' commission of armed robbery as one aggravating circumstance, denied that the murder was especially heinous, and implied that Myles' life should be spared because he confessed his crime and because he never going to be back from life imprisonment." Defense counsel did not expressly ask the jury to spare Myles' life or directly argue that it should not impose a death sentence. His entire closing argument consisted of the following:
"The State relies on the idea that there was an armed robbery in this case, for one, aggravating circumstance, and we can't deny it was there. We also can't deny that this charge is still pending. That means it hasn't been tried yet. There are two separate bills of information in this case, two indictments, that is. One is armed robbery, one is a first degree murder. That is still a separate incident to this, a separate trial to this. At the idea of whether it was especially atrocious or cruel manner in which this murder was done. There was a murder done and nobody denies that. Dr. Evans didn't mention murder. When he was on the stand he never said it was especially atrocious, especially cruel. Any murder is cruel. Especially cruel means done in some, I would think, highly unusual way. There was some testimony from Dr. Genovese that she was beaten. There was never any testimony that she was beaten severely. Some contusions, the hemotoma, the small scrapes on her arm. Look at the words `especially atrocious and cruel.' I think that sets it apart from a murder. A murder is a murder. It's not good, it's cruel, it's atrocious. The foreign word is `especially atrocious.' When you look down at the mitigating circumstances, you always have to look under number H, whether there's any relevant mitigating circumstances. In a case like this and you having to decide on capital punishment or life imprisonment he's never going to be back from life imprisonment, or you're going to put him in the electric chair. Bo Myles made a statement. You have to determine that there's-he's really no good to be on this earth. He made a statement. The law will-it hasn't come out but the Judge will inform you that you can't plead guilty to first degree murder. He made a statement. He admitted that he did it. I *29 would have to classify that as a mitigating circumstance. He never lied to you. Everything that's on that statement, he told the truth. That's all."
In rebuttal, the prosecuting attorney argued that the death penalty should be imposed because the murder was premeditated and because "[n]obody can guarantee you that nobody can ever get probation or parole. There's no such thing as that." Defense counsel did not object to the prosecutor's argument which implied that, because a true life sentence is an illusion, the death penalty should be imposed to insure that a convicted murderer will never return to society.
The trial judge's instructions to the jury at the sentencing hearing were, in general, excellent. The charges did not, however, inform the jury that, if it was unable to unanimously agree on a recommendation, the Court would impose a sentence of life imprisonment without benefit of parole, probation or suspension of sentence. Defense counsel failed to object to the instructions during the sentencing hearing or to request additional instructions.
After its deliberations, the jury unanimously recommended that the defendant be sentenced to death, and set forth one aggravating circumstance found: "The defendant was engaged in the perpetration or attempted perpetration of aggravated rape, aggravated kidnapping, aggravated burglary, or armed robbery." The defendant was sentenced to death in accordance with the jury's recommendation.
We are called upon to: (1) define the degree of effectiveness of defense counsel's assistance required in a death sentence hearing and (2) decide whether Myles' attorney's performance fell below this level of effectiveness.
As we said on original hearing, "certainly a defendant who faces death deserves a vigorous advocacy of his cause." P. 23. Our adversary system of justice depends upon this vigorous and effective advocacy to function properly. While the importance of effective representation is widely recognized, no single articulation of the standard of competency constitutionally required has been accepted. The United States Supreme Court has never directly confronted this matter though in McMann v. Richardson, 397 U.S. 759, 771, n.14, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 762, 773 (1970), it stated: "It has long been recognized that the right to counsel is the right to the effective assistance of counsel" and that counsel's performance must be "within the range of competence demanded of attorneys in criminal cases." Formulation of this range of competence was left to the "good sense and discretion of trial courts." Id.
An early formulation of this standard of competency became known as the "farce and mockery test." Counsel's ineffective assistance violated defendant's sixth amendment right only if the lawyer's incompetence was so gross that it rendered the proceedings a "farce and mockery of justice." Diggs v. Welch, 148 F.2d 667 (D.C.Cir.), cert. denied, 325 U.S. 889, 65 S.Ct. 1576, 89 L.Ed. 2002 (1945). This standard is still followed, at least nominally, by two circuits (Second and Tenth) and by roughly nineteen states. Erickson, Standards of Competency for Defense Counsel in a Criminal Case, 17 Am.Crim.L.Rev. 233, 239 n.52 and 53 (1979). The "farce and mockery" standard, however, has been "uniformly criticized by commentators." Gard, Ineffective Assistance of Counsel-Standards and Remedies, 41 Mo.L.Rev. 483, 494 (1976). See also, Identifying and Remedying Ineffective Assistance of Criminal Defense Counsel: A New Look after United States v. Decoster, 93 Harv.L.Rev. 752 (1980). Chief Judge Bazelon referred to this standard as being a mockery of the Sixth Amendment itself. Bazelon, The Defective Assistance of Counsel, 42 U.Cin.L. Rev. 1, 28 (1973). There has been a marked movement to seek other formulations by both state and federal courts.
As early as 1960, the Fifth Circuit stated that a defendant is entitled to "counsel reasonably likely to render and rendering reasonably effective assistance." McKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 *30 L.Ed.2d 78 (1961). See Simpson, Standards of Attorney Competence in the Fifth Circuit, 54 Tex.L.Rev. 1081 (1976). This standard has also been accepted by the Sixth Circuit as well as several states. Erickson, supra, at 240.
Other jurisdictions following the Third Circuit's lead in Moore v. United States, 432 F.2d 730 (3d Cir. 1970), have defined the standard as representation within the range of competence demanded of attorneys in criminal trials. Still other courts have attempted to formulate more specific standards by incorporating both case law and guidelines proposed by the American Bar Association. E. g., United States v. Decoster, 487 F.2d 1197 (D.C.Cir. 1973); Coles v. Peyton, 389 F.2d 224 (4th Cir.), cert. denied 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968); Jackson v. Warden, Nevada State Prison, 537 P.2d 473 (Nev. 1975); State v. Leadinghorse, 192 Neb. 485, 222 N.W.2d 573 (1974); State v. Thomas, 203 S.E.2d 445 (W.Va. 1974). See ABA Standards Relating to the Administration of Criminal Justice, The Defense Function (1974). We believe that this attempt at specificity is desirable and necessary to give substance to the particular word formula chosen for the minimal level of competency.
In determining the proper standard of competency to be applied, we are ever mindful that this is a capital case. We must not only select a standard of substance, but also give close scrutiny to insure adherence to this standard. The penalty of death is qualitatively different from a sentence of imprisonment. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the jury's determination that death is the appropriate punishment in a specific case. Lockett v. Ohio, 438 U.S. 586, 603, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 989 (1978); Gardner v. Florida, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393, 405 (1977) (White, J., concurring); Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944, 961 (1976). This necessary reliability is undermined unless it appears that the defendant received the competent assistance of an attorney acting as a diligent, conscientious advocate for his life. See United States v. Decoster, 487 F.2d 1197 (D.C.Cir. 1973); People v. Pope, 23 Cal.3d 412, 152 Cal.Rptr. 732, 590 P.2d 859 (Cal. 1979).
Applying this standard, we conclude that the omissions by defendant's counsel establish that the assistance afforded at his sentencing hearing was constitutionally inadequate. The advocacy for Myles' life was tepid and virtually nonexistent.
In his closing argument the defense counsel did little more than acknowledge the existence of an aggravating circumstance, state that the confession may be regarded as a mitigating circumstance, and submit the matter to the jury. He did not ask the jury to spare the defendant's life. He did not remind the jury that Elvin Myles is a human being or urge the jurors to be mindful of their awesome responsibility in deliberately choosing whether he should live or die. Nor did he emphasize to the jurors any of their legal obligations designed to prevent the arbitrary or capricious imposition of the death penalty, e. g., the requirement that they base their findings upon a beyond a reasonable doubt certainty; their duty to weigh any aggravating circumstance found against any and all mitigating circumstances; the duty of each individual juror to hold fast to his honest convictions and to vote to prevent a unanimous verdict in the event he is convinced that the death penalty is inappropriate.
Moreover, the defense attorney's lack-luster argument followed his submission of the case for his client's life without evidence. We cannot say that counsel acted unreasonably in deciding not to present any evidence. Although the sentencing report reveals some mitigating evidence, consisting of a severely deprived childhood resulting from the death of his mother at the hand of his father, the countervailing evidence of Myles' antisocial character and propensities *31 was substantial. Having rested his client's case without evidence, however, it was even more imperative that defense counsel advocate his client's cause in closing argument. The practice of law is a partisan endeavor requiring those who engage in it to represent their clients vigorously even in the face of overwhelming adversity.
The attorney's closing argument, amounting to little more than a mechanical submission of the defendant's fate to the decision-making process with no attempt to influence it, definitely fell below the minimum standard of competency constitutionally required. "[T]he failure to make a closing argument or making one which is clearly perfunctory has been found to constitute ineffective assistance." Gard, supra, at 491. Matthews v. United States, 449 F.2d 985 (D.C.Cir. 1971); Johns v. Smyth, 176 F.Supp. 949 (E.D.Va. 1959).
This Court does not sit to second-guess strategic and tactical choices made by trial counsel. We are aware that understatement and deliberate omission may be sometimes based on informed tactical judgment. However, when counsel's acts and omissions reduce his role to one approaching that of a neutral observer, a defendant is denied the effective assistance of counsel.
For the foregoing reasons it is clear on the record before us that petitioner did not receive the effective assistance of counsel to which he was entitled under the constitution. The sentence of death must be vacated and the case remanded to the trial court for a new sentencing hearing, at which the defendant shall be represented by newly assigned counsel.
DEATH SENTENCE SET ASIDE; CASE REMANDED FOR NEW SENTENCING HEARING.
MARCUS, J., dissents.
BLANCHE, J., dissents and assigns reasons.
BLANCHE, Justice (dissenting).
Defendant executed an 86-year-old woman and robbed the department store she was tending. He confessed to the crime. Other evidence showed how the weapon used was disposed of and how defendant entertained three women companions with the circumstances of the murder.
A lawyer's obligation is to see that the defendant gets a fair trial and the most any lawyer could do with this case is rest on the presumption of innocence and hold the prosecutor's feet to the fire.
Evidently, the majority of this Court must have believed that counsel performed adequately during the guilt portion of the trial, as the defendant's conviction was affirmed. However, the majority, in reviewing the death sentence, indicates that counsel did not perform up to constitutional muster at the sentencing hearing. The mitigating circumstance which the majority claims could have been used to influence the jury's mercy was to point to his severely deprived childhood, but counsel did not offer this as a mitigating circumstance; that his argument was "lackluster"; that he did not remind the jury that defendant was a "human being", or remind them of the awesome responsibility in deliberately choosing whether he should live or die. I would say that, in light of the aggravating circumstances of the crime and the lack of mitigating circumstances which could have been shown in the defendant's behalf, there was very little to argue. In my opinion, representation by counsel did not fall to such a level of incompetence as to deny the defendant effective assistance of counsel.
NOTES
[1] On rehearing we noted that Article 905.4(f), whether the offender was imprisoned for commission of an unrelated forcible felony at the time of the offense, did not focus on the circumstances with which the killing was accomplished and therefore was not included in the amended definition of first degree murder.
[2] Defense counsel filed numerous pretrial motions including: motion for a change of venue; motion to suppress the confession; motion for reports of examinations and tests; motion for confessions of codefendants; motion for statements by the defendant; motion for hearsay statements made by coconspirators; motion for the defendant's prior criminal record; motion for disclosure of exculpatory evidence; motion for production of documents and tangible evidence; and a motion for continuance.
[1] For instance, two witnesses for the state (Dexter Leonard and Ms. Jackie Henderson) had, after the crime, aided the accused in hiding and in his efforts to dispose of his bloody clothes. They were apparently not prosecuted as accessories to the crime. However, only minor effort by cross-examination was made to develop their bias or interest (arising out of their apparent agreement with the state to testify, in order to save themselves from any prosecution whatsoever), nor as to the possible inaccuracy of their testimony of the inculpatory statements allegedly made by the accused after the crime.

Again, the police officer who recorded the defendant's confession was cross-examined in only two pages, which did not attempt to probe in any detail the circumstances surrounding the confession.
[*] The Honorable Paul B. Landry participated in this decision as an Associate Justice pro tempore.
[**] Mr. John Wilson Reed, who was specially appointed by this court to represent defendant in this rehearing was NOT defendant's attorney during the sentence hearing or the original hearing in this court.