538 So.2d 175 (1988)
STATE of Louisiana
v.
Keith E. MESSIAH.
No. 85-KA-1659.
Supreme Court of Louisiana.
December 12, 1988.
Rehearing Denied January 19, 1989.
*176 William M. Guste, Jr., Atty. Gen., Harry F. Connick, Dist. Atty., Beryl McSmith, Asst. Dist. Atty., for plaintiff-appellee.
Dwight Doskey, Orleans Indigent Defender Program, for defendant-appellant.
DIXON, Chief Justice.
Keith E. Messiah appeals his conviction for first degree murder and his sentence of death.
On Mardi Gras day, February 15, 1983, Bernice Holman was shot and killed in the parking lot of the Popeye's Fried Chicken located on the corner of South Claiborne Avenue and Toledano Street in New Orleans.
Ms. Holman and five friends, James and Maureen Barnes, Eddie Hager, Debra Adams and Claire Burbank, had driven from Panama City, Florida to New Orleans on the previous day. They spent the night in a west bank motel and drove to St. Charles Avenue early on Mardi Gras morning to watch the parades.
At approximately 2:30 p.m. that afternoon they decided to leave New Orleans and return to Florida. As they began the drive back to the interstate highway, they saw Popeye's and decided to stop to buy some chicken and use the restrooms. Although they were told that there were no restrooms available for public use, they *177 bought chicken and remained in the parking lot eating the food. Mr. Barnes, Mr. Hager and Ms. Adams stood at the front of the car; Ms. Barnes, Ms. Holman and Ms. Burbank remained insideBarnes in the back seat on the passenger side of the car and Burbank and Holman in the front seat. As the group was eating, a man later identified as the defendant, walked between the car and the three persons outside; the man then turned around, holding a .357 magnum pistol and stated: "I want y'all's money and I want it now." The three outside the car placed their money on the hood of the car. Mr. Hager also placed his shoes on the hood.
The defendant then swung his gun toward the windshield, beat on the hood with his other hand and said to the women inside, "I want y'all's money too." Ms. Holman got out of the front seat, reached her hand into her pocket and said: "I don't have any money." Defendant replied: "you gotta" or "you better" and then shot Ms. Holman in the face. Defendant grabbed the money from the hood of the car and fled. Ms. Holman died at the scene.
The next day New Orleans police Crime Stoppers Unit received an anonymous phone call. The caller stated that the person responsible for the Mardi Gras murder at Popeye's was Keith Messiah; the caller also related that Messiah lived in Apartment A, 3205 Clara Street and that the gun used in the robbery could be found under a mattress at that apartment.
Later that same day police obtained an arrest warrant for Keith Messiah and a search warrant for Apartment A on Clara Street. Police did not find Messiah at the apartment but were told by one of the occupants that the defendant was at his brother's house in Baton Rouge.
On February 17, 1983, New Orleans police flew to Panama City, Florida, taking with them a photographic line-up containing eight photographs, including defendant's. At the Panama City police station, four of the eyewitnesses were shown the photographs.[1] Each witness viewed the photographs separately and the witnesses were kept separated until all had viewed the photographs and identified a suspect. Three of the witnesses positively identified the defendant from the photograph. The other witness made a tentative identification.
Messiah was arrested at his brother's house in Baton Rouge that same day. According to the homicide detective investigating the case, Messiah was transported from Baton Rouge on February 17, 1983 and brought to the homicide office at police headquarters. The detective stated that he orally advised Messiah of his constitutional rights and that defendant made a verbal statement to him. According to the detective, the substance of Messiah's statement was that "he was attempting to r[o]b the victim and her companions and during the course of the robbery he pointed the gun in the direction of the group, the gun went off, the victim fell to the ground. He got scared, grabbed up the money from the hood of the car and fled."
In March, 1983 the Orleans Parish Grand Jury indicted Keith Messiah for the first degree murder of Bernice Holman.
At the trial, the four eyewitnesses testified for the state and positively identified Messiah as the perpetrator.
Margaret Stewart also testified for the state. She stated that she had known the defendant since he had been six years old and that he was a frequent visitor to her apartment, located two and a half blocks from the Popeye's. Ms. Stewart related that on the day of the murder, Messiah had been in and out of her apartment all day. When she left the apartment at approximately 1:30 p.m. or quarter to 2:00, defendant was not there. However, when she returned to the apartment at approximately 4:30 or 5:00 p.m., she found Messiah sitting on the closed toilet in her bathroom; paper money was scattered all over the bathroom floor. Later that day Messiah gave Ms. Stewart $25.00.
*178 The jury found Messiah guilty as charged and recommended the death penalty having found two statutory aggravating circumstances: (1) that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery; (2) that the defendant knowingly created a risk of death or great bodily harm to more than one person.
Messiah now raises nine assignments of error. In this opinion, we find no meritorious assignments of error in the guilt phase of defendant's trial.
FIRST ASSIGNMENT OF ERROR
In his first assignment of error, Messiah contends that the trial court erred in denying the motion to suppress his confession. At a pretrial hearing on April 29, 1983, the arresting officer, Detective Raymond Miller of the New Orleans Homicide Unit, testified as to the circumstances surrounding the confession. As he did at the trial, Miller attested to the contents of Messiah's oral confession and that Messiah had been advised of his rights orally. Additionally, Miller testified that, in accordance with police policy, he did not ask Messiah to sign a formal rights form because Messiah indicated that he did not wish to render a typed statement. Miller also testified that Messiah was not forced, threatened or intimidated in any way into making the statement.
Messiah testified in his own behalf at the suppression hearing. He stated that he was not advised of his rights and that he did not make a statement to the detective; he did not allege that he was coerced or threatened in any way. Moreover, the fact that Messiah did not sign a waiver form in itself does not indicate involuntariness; the presence of defendant's signature on a waiver form is only one element among many in determining the voluntariness of a statement. State v. Singleton, 381 So.2d 828, 830 (La.1980).
In reviewing the trial judge's ruling on admissibility, his conclusions as to the credibility of witnesses are accorded great weight. State v. Neslo, 433 So.2d 73, 80 (La.1983). Here, the trial judge obviously accorded the testimony of the detective greater weight than that of the defendant. In doing this, the trial court did not abuse its discretion in denying Messiah's motion to suppress the confession.
This assignment lacks merit.
SECOND ASSIGNMENT OF ERROR
Next, Messiah asserts that the trial court erred in failing to allow the defense to rehabilitate a prospective juror excused on Witherspoon grounds.
In questioning a prospective juror, the following colloquy occurred:
"MR. DUBELIER [prosecutor]: Do you feel, regardless of what is presented as evidence during deliberations that you would say, `I can't consider the death penalty, I could consider anything else but I couldn't consider the death penalty?'
A JUROR: In my mind it would be very difficult.
THE COURT: Unfortunately, we have to have a specific answer. You have to say whether you could or could not.
A JUROR: If I have to make that decision, I would say I could not consider it.
MR. ZIBILICH [defense counsel]: Can I ask her a question?
THE COURT: I don't want to spend the whole day on this. I don't know what you are going to bring out.
MR. ZIBILICH: Nobody is trying to put words in your mouth but you did indicate that you might, earlier on, that you didn't know the circumstances, which indicates to me that there could be some set of circumstances so terrible, so horrible, not that you would be prepared to say right now that you would vote for the death penalty but you could consider that? That is all you have to be able to do. Are you saying under no circumstances could you even consider voting for the death penalty?
A JUROR: Yes, I am saying that.
MR. ZIBILICH: All right, thank you, ma'am.
THE COURT: All right, thank you, ma'am, you are excused. Call another juror."
*179 The state properly challenged this prospective juror for cause because her answers on voir dire indicated that she would automatically vote against the death penalty despite any evidence adduced at trial. C.Cr.P. 798(2). See also Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 1777 fn. 21, 20 L.Ed.2d 776 (1968).
As the colloquy reveals, however, the trial judge gave defense counsel the opportunity to rehabilitate the prospective juror. See State v. David, 425 So.2d 1241, 1250 (La. 1983); State v. Penns, 407 So.2d 678, 682 (La.1981).
When her answers revealed that she was unequivocally opposed to the death penalty, the prospective juror was properly excused.
This assignment lacks merit.
THIRD ASSIGNMENT OF ERROR
In his third assignment of error, Messiah asserts that the state failed to prove the existence of a specific intent to kill. He contends that the state proved him guilty of no more than second degree murder. R.S. 14:30.1(2).
"Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." R.S. 14:10(1).
"... for though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction." R.S. 15:445.
Messiah's statement to the investigating detective suggests that his gun simply "went off." However, the evidence does not support such a finding.
Eyewitnesses to the shooting, Ms. Holman's companions, testified that the defendant was armed with a large handgun and demanded money from the group of six people in the Popeye's parking lot. After Ms. Holman stated that she had no money and after the defendant replied, "you better" or "you gotta [have some money]," Messiah shot the victim in the face. One witness testified that she actually saw the defendant pull the trigger of the gun. This evidence negates the possibility of an accidental shooting and amply supports a finding of specific intent to kill or inflict great bodily harm. See State v. Neslo, supra at 87; State v. Williams, 383 So.2d 369, 373 (La.1980); State v. Procell, 365 So.2d 484, 492 (La.1978).
This assignment lacks merit.
FOURTH ASSIGNMENT OF ERROR
In this fourth assignment of error, the defendant complains that the trial judge erred in charging the jury on specific intent. The judge gave the following charge:
"The law with reference to specific intent to kill or inflict great bodily harm is as follows: First of all, the time element. The law knows no specific time within which an intent to kill or inflict great bodily harm must be formed so as to make a homicide murder. If the will of the person accompanies the act a moment antecedent to the act which causes the death, it is completely sufficient as if it were a day or any other time. It is sufficient if there was a design or determination to inflict great bodily harm or to kill formed in the mind of the slayer any moment before or at the time of the blow. If an assault is made on a person with the intent of killingnot with the intent of killing but with the intent of inflicting great bodily harm and death is caused, it is murder. A specific intent to kill might also be implied in any deliberate, cruel act consciously againstby one person against another. If, for instance, a man armed with a dangerous weapon should suddenly with little or no apparent provocation kill another, then it could be inferred from all those surrounding facts and circumstances that his intention was to commit murder."
After retiring to deliberate, the jury returned to the courtroom and asked the following questions on intent:
"JUROR: Define intent.
THE COURT: Intent is a condition of the mind. You cannot see, feel, hear or touch intent. Therefore, somebody's intent can be arrived at by a process of deduction and inference by an examination of all the surrounding facts and circumstances and all the evidence in the *180 case. You consider all of that in arriving at what somebody's intent was. You can't look into somebody's mind and tell what their intent is, you have to examine what happened, what were the circumstances and consider that together with all the evidence in the case in determining what that person's intent was at the time that the act was committed. In other words, there has to be a specific intent at the time of the killing to either kill or inflict great bodily harm while you are engaged in the perpetration of an armed robbery.
I don't know any other way to define intent except that. Does that help any?
JUROR: Your Honor, intent meaning at the exact time of the killing?
THE COURT: Yes, ma'am."
The exact portion of the instructions which Messiah contends is erroneous is not clear from this unbriefed argument. He may be complaining that the portion of the charge where the judge stated, "A specific intent to kill might also be implied in any deliberate, cruel act consciously ... by one person against another," impermissibly shifted the burden of proof to the defendant to prove that he lacked the requisite specific intent to support a verdict for first degree murder.
The due process clause protects a defendant against a conviction except upon proof beyond a reasonable doubt of every element of the crime charged. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Therefore, the state cannot permissibly shift to the defendant the burden of proving an element of the offense by use of a conclusive presumption. A presumption that is not conclusive but which has the effect of shifting the burden of persuasion to the defendant would also be constitutionally defective. Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The federal standard is whether a reasonable juror could have understood that the charge shifted the burden of persuasion to the defendant. Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 1972, 85 L.Ed.2d 344 (1985).
In this case, the instruction merely sets out a permissive inference which leaves the factfinder free to credit or reject the inference. The instruction does not shift the burden of proof. In at least three cases this court has held that similar instructions did not violate the rules of either Winship or Sandstrom. State v. James, 431 So.2d 399, 404 (La.1983); State v. Davis, 411 So.2d 2, 6 (La.1982); State v. Mattheson, 407 So.2d 1150, 1161 (La.1982).
This assignment lacks merit.
FIFTH ASSIGNMENT OF ERROR
Next, Messiah contends that the trial court erred at the sentencing phase in allowing the introduction of guilty pleas prior to a showing by the state that the defendant had been fully advised of his constitutional rights at the time the pleas were made.
During the sentencing phase, the state introduced evidence of three prior convictionspossession of a pistol with an obliterated serial number, possession of stolen property valued at $499, and unlawfully concealing a firearm on his person. The record indicates that Messiah pleaded guilty to all three crimes.
The state offered the evidence of the prior convictions to prove one of the aggravating circumstances on which it relied that the defendant had a significant prior history of criminal activity. At the time of the trial, C.Cr.P. 905.4 included among the list of aggravating circumstances that "the offender was previously convicted of an unrelated murder, aggravated rape or aggravated kidnapping or has a significant prior history of criminal activity."[2]
In this case the defendant's motion for discovery included a request for copies of his arrest and conviction records. Documents showing the prior convictions are in the record. Assuming that the state complied with the defendant's request, defense counsel was aware of prior criminal activity. To the defense interrogatory, "is it the *181 state's intention to offer evidence of other crimes and/or criminal proceedings?", the state replied "not in trial-in-chief." Assuming that the phrase "trial in chief" applies solely to the guilt phase, the state's response was an implication that it would use the information at the penalty phase. Defense counsel had sufficient information to prepare against the use of the earlier convictions in the sentencing phase, and, in fact, stipulated that the defendant Keith Messiah was the same individual convicted on each of the three charges.
There was no lack of notice.
The argument that the evidence of prior convictions should not have been admitted before proof that the guilty pleas were free and voluntary is without merit. The same argument was made in State v. Mattheson, 407 So.2d 1150, 1164 (La.1982), and found to be without merit as follows:
"... The convictions were not being used to enhance punishment; rather, defendant's past criminal history was merely a part of the total picture of his `character and propensities.' It did not of itself trigger added penalties. Hence, we do not consider the sentencing hearing to be one of those instances where the state is required to affirmatively show that defendant was represented by counsel or had waived same before a prior conviction may be used to show the character and propensities of the defendant."
This assignment lacks merit.
SEVENTH ASSIGNMENT OF ERROR
Defendant also contends that the trial court erred in providing the jury with a list of all aggravating circumstances including those not argued by the state.
In instructing the jury during the penalty phase, the judge stated:
"The statutory aggravating circumstances applicable in this case are:
That the offender was engaged in the perpetration of the crime of armed robbery.
That the offense was committed in an especially heinous, atrocious or cruel manner.
This is what is alleged by the State. It is up to you to determine, from the examination of all the facts and circumstances of the testimony on the trial as well as has been offered at this hearing.
The clerk will furnish you with a list of each aggravating and mitigating circumstance which you may bring with you during your deliberation. Before you decide that a sentence of death should be imposed you must unanimously find beyond a reasonable doubt that at least one statutory aggravating circumstance exists."
The judge later stated during the instructions:
"The fact you are given a list of aggravating and mitigating circumstances should not cause you to infer that the Court believed any of them do or do not exist. The law requires the jury be given such a list in every case.
Whether aggravating or mitigating circumstances exist is a fact for you to determine based on the evidence presented."
The judge was following the law then in effect. At the time of the trial in 1983, C.Cr.P. 905.3 provided that the "jury shall be furnished with a copy of the statutory and mitigating circumstances." This article was amended in 1985, and now provides that the court may provide the jury with a list of the aggravating and mitigating circumstances.
In an appeal decided shortly before the trial of the instant case, the defendant made a similar argument. There we stated:
"We can find no reversible merit in counsel's argument. The court clearly instructed the jury that it must review the evidence before it and determine which, if any, of the aggravating circumstances was proven beyond a reasonable doubt to exist. The trial judge did not tell the jury to disregard the aggravating circumstances which obviously could not be found to exist, but such instructions are implicit in the ones given. Furthermore, we cannot accept counsel's argument as it suggests that a judge, with the aid of *182 counsel, should review the nine aggravating circumstances and instruct the jury only as to the ones supported by the evidence at trial. While such a procedure is permissible and desirable, it is not required constitutionally or statutorily." State v. Flowers, 441 So.2d 707, 717 (La. 1983).
Likewise, in this case, the judge clearly instructed the jury that although they were given a list of all aggravating circumstances that they should determine, based upon the evidence, whether any such circumstances exist.
This assignment lacks merit.
EIGHTH ASSIGNMENT OF ERROR
Messiah's eighth assignment of error is that the trial court erred in charging the jury concerning the possibility of pardon and parole.
After retiring to deliberate during the penalty phase, the jury returned to the courtroom apparently confused over the meaning of a life sentence and the following colloquy took place:
"A JUROR: Sir, the jurors would like to know if the suspect is sentenced to life imprisonment is there a possibility that he can be pardoned by the Governor?
THE COURT: I am going to read you what the law defines life as. Life means imprisonment at hard labor for the rest of your life without benefit of parole, probation or suspension of sentence. It means what it says. That is all I can tell you. It means what it says. It means imprisonment for life at hard labor, no parole, no probation, no suspension. That's what it means. I can only read you the law as the Legislature has written it in the book. I can't go any further than that because I have answered your question as the law states it. That's what the law says and I am giving you what the law says and I am telling you that's what the law says and that's what the law means."
A JUROR: Does the same apply to the death penalty or can someone get out?
THE COURT: Death means death. I am not going to go through everything you have been reading in the newspaper about death penalties. I can't go into that. Death means death, life means life.
A JUROR: Your Honor, excuse me but can the law change? If he is given life imprisonment, can the law change and he, because of that changed law
THE COURT: Any law that would change after he was convicted would not apply to him. He can only be tried under the law as it existed at the time you are tried.
A JUROR: I have one other question. Of course, this is idealistic but if he is given life imprisonment, will he have the benefit to rehabilitation where he could do something functional behind bars? I know he will never be in society.
THE COURT: I can't answer that because I don't know what the Department of Corrections does exceptI am sure the Department of Corrections has some aim of rehabilitation but what it does, it would be speculation on my part. I have no connection with the Department of Corrections. I don't know how they operate, I don't know what they do. Their duty is to carry out sentences as imposed by judges and juries.
We are getting to the point where I can't answer you any further than that. The law means both things, the law means life, the law means death.
A JUROR: Judge, do you know by chance how the Governor gets the power to pardon people?
THE COURT: I cannot talk about anything other than what I have told you. That's irrelevant to this proceeding, let me just say that to you. That has nothing to do with this proceeding or with your duty as jurors. You cannot go outside of what you have here in arriving at your decision. You have to confine yourselves to the evidence you have heard and the law I have given you. That is all I can tell you. The law means what it says.
A JUROR: With the life sentence that means that he will be in jail until he dies? *183 THE COURT: That's what the sentence says, that's what the sentence means as passed by the Legislature of the state and signed by the Governor. The law also says that he shall die, he shall die.
A JUROR: By natural causes?
THE COURT: He will die by electrocution. That's the method that this state uses.
I can't go any farther. I know it's frustrating you but I have to follow the law as it is written and give it to you as it has been passed by the Legislature. I can only tell you what they have said, what the Governor has signed and what has become the law of this state both as to death and life.
You will have to go back and deliberate based on what I have told you."
When faced with the question on the possibility of a pardon, the judge correctly stated the meaning of life imprisonment as defined by statute. The judge did not speculate or erroneously charge the jury on the possibility of pardon or commutation of sentence as did the court in State v. Lindsey, 404 So.2d 466, 484 (La.1981). The judge's answer was the only one he could have given. The discussion of the possibility of pardon or commutation of sentence by the trial judge interjects an arbitrary factor into the sentencing proceeding. State v. Lindsey, supra. When pressed by the jury on the subject of the governor's power to pardon individuals, the judge in this case correctly told the jury that such a subject was irrelevant to the proceedings and that their duty as jurors was to consider the evidence presented during the penalty trial and not consider anything outside the evidence. The judge's refusal to talk further on the subject was the correct response. State v. Kirkpatrick, 443 So.2d 546 (La.1983).
This assignment lacks merit.
NINTH ASSIGNMENT OF ERROR
Messiah finally contends that the evidence was insufficient to justify a finding that he threatened more than one life.
The jury found the existence of two aggravating circumstances: that the murder occurred during the commission of an armed robbery and that the defendant knowingly created a risk of death or great bodily harm to more than one person. The defendant does not question the jury's finding of an armed robbery as an aggravating circumstance. The evidence unquestionably supports a finding that the killing was committed in the course of an armed robbery. Even though the state presented no evidence to show that the victim of the homicide was a victim of the armed robbery, the sequence of events supports a finding that the killing occurred during the commission of an armed robbery. The victims of the robbery testified that the defendant approached the group, pulled a gun and demanded their money. When the murder victim got out of the car and said she did not have any money, the defendant said "you gotta" or "you better" and shot her in the face. After firing the shot, Messiah grabbed the money the others had placed on the hood of the car and fled.
In State v. Williams, supra, the defendant, armed with a sawed-off shotgun, and a partner entered a grocery store. While the defendant's partner was attempting to disarm the store's security guard, the guard made a move for his pistol and the defendant immediately shot the guard in the face. The defendant and his partner then removed money from the store register and safe while holding various people at gun point. We held that "[t]he evidence clearly supports the conclusion that the victim was murdered in the course of an armed robbery." Id. at 374. This court further stated that "there is no doubt that the armed robbery was an immediate concomitant of the murder and formed, in conjunction with it, one continuous transaction." Id. at 372.
Likewise, in the instant case the killing and the armed robbery formed one continuous transaction. The jury appropriately found that this was an aggravating circumstance.
In order to impose the death penalty, the jury must find the existence of at least one aggravating circumstance beyond a reasonable doubt. C.Cr.P. 905.3. This court has upheld death sentences when at *184 least one of the aggravating circumstances relied on by the jury is supported by the evidence, even though another aggravating circumstance is not so supported. This is true as long as the evidence of the possibly unproven circumstances do not inject an arbitrary factor into the proceeding. State v. Wilson, 467 So.2d 503, 522 (La.1985); State v. Rushing, 464 So.2d 268, 275 (La. 1985); State v. Wingo, 457 So.2d 1159, 1169 (La.1984). The failure to prove another aggravating circumstance does not introduce an arbitrary factor in the sentencing procedure unless this court determines that but for the influence of the evidence of the legally insufficient aggravating circumstance, the jury would not have imposed the death penalty. State v. Rushing, supra.
In this case, there was no arbitrary factor.
This assignment lacks merit.

DECREE
For the foregoing reasons defendant's conviction is affirmed.[3]
CALOGERO, Justice.
In the review of this first degree murder conviction and death sentence, this court's unamimity ends following affirmance of defendant's conviction. A majority, not a unanimous court, concludes that the death sentence, as well as the conviction, should be affirmed.[4]
This portion of the review addresses only the second or PENALTY PHASE of defendant's bifurcated trial.[5]

CAPITAL SENTENCE REVIEW
Supreme Court Rule 28 and La.C.Cr.P. art. 905.9 require that this Court review every death sentence to determine whether the sentence is constitutionally excessive. The determination is made after the Court considers whether the sentence was imposed under the influence of passion, prejudice, or arbitrary factors; whether the evidence supports a finding of a statutory aggravating circumstance; and whether the sentence is disproportionate to the penalty imposed in other cases considering both the offense and the offender.
The Uniform Capital Sentence Report provides the following information on defendant: Keith Messiah is a black male who has never been married. At the time of his arrest, defendant claimed to be contributing to the support of his two children. He is one of three children. His father and mother were never married. His highest level of education is unknown. His I.Q. was determined to be in the range between 70 and 100. Messiah was 25 years old at the time the crime was committed.
The Post-Sentence Investigation Report (PSI) indicates that defendant has held various unskilled labor jobs from 1977 through 1981. It was verified that defendant was *185 employed at Touro Infirmary from January, 1977, through September, 1977, as a Housekeeper I. He was employed as a laborer with the New Orleans Sewerage and Water Board from December, 1977, through January, 1978. He was employed at the Monteleone Hotel as a house man and member of the clean-up crew from 1980 through 1981, when he was discharged for theft. Although unverified, defendant claimed to have also worked for the New Orleans Hilton and Cherry Potato Chip Company in Baton Rouge.
The PSI indicates that there is no verifiable juvenile record on defendant. As an adult, defendant was convicted of two felonies, (possession of a firearm with an obliterated serial number, and possession of stolen property valued at $499), one misdemeanor (illegal carrying of weapons), and two municipal convictions (theft by fraud valued at $11.00 and disturbing the peace by threats.) The victim was a 44 year old white female who was not acquainted with the defendant.

PASSION, PREJUDICE AND ARBITRARY FACTORS
Although the defendant is black and the victim was white, racial prejudice as an arbitrary factor is not evident from the record, nor has such a suggestion been made by appellate counsel. Members of defendant's race were selected for the petit jury, and served.
The trial judge correctly charged the jury on the necessity of finding the existence of at least one aggravating circumstance before the jury might consider recommending the death penalty. He also instructed the jury that they must also consider any mitigating circumstances before recommending death. The jury found two aggravating circumstances. Those were: that the murder occurred during the commission of an armed robbery and that the defendant knowingly created a risk of death or great bodily harm to more than one person. The first of these was clearly proven. The second presents a closer issue, but, in all events, the finding of only one aggravating circumstance is sufficient to support a death penalty recommendation. See ASSIGNMENT OF ERROR # 9 in the guilt phase portion of this opinion. Notwithstanding the prosecutor's argument to the contrary, the jury did not find that the offense was particularly atrocious or heinous.
A review of the record indicates, therefore, that neither passion nor prejudice was interjected into the proceeding.
Defendant argues the existence of three arbitrary factors. One arbitrary factor argued by defendant is that the trial court erred in furnishing the jury a complete list of aggravating circumstances. This argument is addressed as ASSIGNMENT OF ERROR # 7 in the portion of this opinion authored by Chief Justice Dixon. Another arbitrary factor argued by defendant is that the trial court erred in explaining the pardon system to the jury. This argument is addressed as ASSIGNMENT OF ERROR # 8 in the portion of this opinion authored by Chief Justice Dixon. For the reasons stated therein, there is no merit to either of these two assignments of error.
The third arbitrary factor argued by defendant is that counsel was ineffective during the sentencing phase. This argument is discussed in detail below.

INEFFECTIVE ASSISTANCE OF COUNSEL
In his sixth assignment of error Messiah asserts that he had ineffective assistance of counsel at the penalty phase of his bifurcated trial. He therefore requests that his death sentence be vacated and the case remanded for a new sentencing hearing.
Since Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the Sixth Amendment of the United States Constitution has been construed to require that a criminal defendant be afforded effective assistance of counsel. As the Supreme Court noted in McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), counsel's performance must be "within the range of competence demanded of attorneys in criminal cases." Id., at 771, 90 S.Ct. at 1449.
*186 In the sentencing phase of a capital case, a defendant is entitled to the "reasonably competent assistance of an attorney acting as a diligent, conscientious advocate for his life." State v. Myles, 389 So.2d 12 at 28 (La.1980) (on rehearing). The reasonableness standard of Myles, supra, was continued by this court in State v. Ratcliff, 416 So.2d 528 at 531 (La.1982), where effective counsel was defined to mean "counsel reasonably likely to render and rendering reasonably effective assistance." The U.S. Supreme Court, setting the standard for effective assistance of counsel in criminal cases and noting that "all but a few state courts have now adopted the `reasonably effective assistance' standard in one formulation or another", concluded that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 692, 690, 104 S.Ct. 2052, 2062, 2065, 80 L.Ed.2d 674 (1984).
Under Strickland, a convicted defendant seeking to reverse his conviction or sentence must show that counsel's performance was deficient and that the deficient performance prejudiced the defense. Id. at 687, 104 S.Ct. at 2064. This court's expression in Myles, supra, focuses on the quality of attorney performance and requires that that performance render reasonably competent assistance with special consideration concerning the attorney's fidelity (i.e., diligent conscientious advocacy). The Strickland decision also focuses on the quality of attorney performance and requires that it be "reasonable under prevailing professional norms", rather than deficient, but adds the specific requirement that the deficiency in performance must prejudice the defendant in order to qualify as ineffective assistance of counsel, a requirement which was only implicitly contemplated by this court in Myles.
Both Myles and Strickland stress the need for reliability in the jury's determination that death is the appropriate punishment in a specific case. 389 So.2d at 30, 466 U.S. at 686, 104 S.Ct. at 2063. A defendant must prove both deficient performance and prejudice as a result of that performance before it can be said that a death sentence "resulted from a breakdown in the adversary process that renders the result unreliable." 466 U.S. at 687, 104 S.Ct. at 2064. It is not necessary for a court to address both components of an ineffectiveness claim if a defendant makes an insufficient showing on one. Strickland, 466 U.S. at 697, 104 S.Ct. at 2069.
For the reasons which follow we conclude that Messiah has not shown that defense counsel rendered a performance which was deficient under Strickland or Myles. We find he was not denied effective effective assistance of counsel during the sentencing phase of his trial.
Defendant relies on Myles, supra, for his primary contention that defendant did not act as a diligent and conscientious advocate for his cause because the representation he received at the sentencing phase of his trial was "tepid and non-existent." In support of this charge, defendant points to:
-The brevity of the closing argument given in his behalf, and
-Defense counsel's failure to present witnesses during the sentencing hearing.
A sympathetic review of defendant's record suggests the following additional points that might be made, and have been made by the Chief Justice in dissent, on defendant's behalf:
-Defense counsel's failure to expressly ask the jury to spare defendant's life,
-Defense counsel's failure to argue defendant's "youth" as a mitigating factor (he was 25 years of age.),
-Defense counsel's failure to argue that defendant's previous convictions were not crimes of violence against persons,
-Defense counsel's failure to argue that the crime was not especially heinous, atrocious, or cruel, and
-Defense counsel's failure to attempt to invoke any residual doubt in the jurors' minds about defendant's "specific intent" to kill.
Trial counsel in this case was an experienced criminal defense attorney regularly assigned by the Orleans Indigent Defender's Program to represent indigent defendants *187 in capital cases. The record before us does not make evident that he was suffering from illness or any disabling condition which might have adversely affected his trial performance.
Defendant was indeed 25 years old. Counsel stated defendant's age in his opening argument and stipulated defendant's age again during the sentencing phase, apparently for whatever value such might have with the jury. True, he apparently chose not to harp on his client's "youth" in his closing argument. It is also true that counsel did not expressly ask the jury to spare defendant's life, did not argue to the jury that the crime was not especially heinous, atrocious or cruel, did not argue that defendant's previous convictions were not crimes of violence against persons, did not attempt to invoke residual doubt in the minds of the juror's as to defendant's "specific intent", and did not present live testimony during the sentencing hearing.
Furthermore, the closing argument given in defendant's behalf was quite brief.
On the other hand, as will be explained hereinafter, it is not evident from this record alone that defense counsel did not act as a "diligent, conscientious advocate" for his client's cause, or that he acted as a "neutral observer", or that his performance was "clearly perfunctory," or a "mechanical submission of the defendant's fate to the decision making process with no attempt to influence it." Myles, 389 So.2d at 28, 31.
Nor in this case have there been pointed out numerous tactical errors (as was the case in State v. Myles, supra,) which, when considered in the aggregate, along with the closing argument, constituted ineffective assistance of counsel.[6]
What we have here, essentially, is a certain amount of "second-guessing" by the defendant. Regarding "second-guessing" in evaluating effectiveness of counsel, the U.S. Supreme Court has the following to say:
A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Strickland, 466 U.S. at 669, 104 S.Ct. at 2055.
In a similar vein, we have said:
This court does not sit to second-guess strategic and tactical choices made by trial counsel. We are aware that understatement and deliberate omission may sometimes be based on informed tactical judgment. Myles, 389 So.2d at 31.
Indeed it is second-guessing in this case to say that trial counsel would have been successful had he emphatically argued defendant's age as a mitigating factor, or had he argued that the crime was not especially heinous, atrocious or cruel, or that defendant's previous convictions (two felonies, one misdemeanor, and two municipal convictions) were not crimes of violence against persons.
Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Strickland, 466 U.S. at 693, 104 S.Ct. at 2067. There are reasons why an informed choice might have prompted defense counsel's trial decisions. While appellate courts may properly distinguish premeditated murder on their facts, and discuss how a single-shot killing during an armed robbery is not especially heinous, atrocious or cruel, who is to say that counsel, through his experience, had not come to learn that it was difficult, if not impossible, to convince a lay jury of that same distinction? Furthermore, his not so arguing could hardly be characterized as deficient considering that the jury did not find heinousness as an *188 aggravating factor. Who is to say that it was not an informed, deliberate, perhaps even plausible, choice in this case not to divert attention from counsel's plea for mercy during the closing argument by reminding the jury that this defendant had committed prior crimes, simply in order to point out that these prior convictions did not involve violence against persons? Who is to say that it was not wise on the part of counsel not to try to convince the jury that, at the age of 25, a person is so "young" as necessarily to warrant sympathy?
Since the jury had already found, in the guilt phase of the trial, that the defendant had the specific intent to kill when he shot the victim in the face, who is to say that it was not the wiser choice on the part of counsel to accentuate his plea for mercy, as he did during the closing argument, rather than repeat his argument that had been unsuccessful in the first phase of the trial, that his client did not have the specific intent to kill when he shot his unarmed female victim in the face? After all, defense counsel was an experienced lawyer in capital cases. It is possible that he may have attempted one or more of the foregoing arguments on trial juries before and found them unsuccessful.
As far as counsel's neglect to present witnesses during the sentencing hearing, there is no way of knowing from this record what effort he made in this regard or what response he did receive or would have received from relatives and others. We do not have in this case such errors in this regard as are present in State ex rel. Busby v. Butler, 538 So.2d 164 (La.1988), a decision also being rendered today, concerning a total lack of effort and investigation in the obtaining of evidence from available witnesses, evidence which "shall be considered mitigating" under C.Cr.P. Art. 905.5(e). Also, unlike Busby, supra, we do not have the benefit of expert opinions by capital defense trial attorneys as to counsel's ineffectiveness at this trial. We do not have the benefit of a post-trial evidentiary hearing, as was the case in Busby, supra. Our appellate review of this charge is limited to a cold trial record.
What this case really comes down to is whether we can isolate on defendant's closing argument and say that the brevity and content of this argument rendered defense counsel's performance not reasonable under prevailing professional norms, Strickland, 466 U.S. at 690, 104 S.Ct. at 2066, deficient, Id. at 686, 104 S.Ct. at 2063, not within the range of competence demanded of attorneys in criminal cases, McMann, 397 U.S. at 771, 90 S.Ct. at 1449, or lacking in diligent, conscientious advocacy for his client's life, Myles, 389 So.2d at 28. Let us, therefore, examine the closing argument.
What this apparently experienced capital case trial lawyer decided was to devote his entire closing argument to a plea for mercy with heavy reliance on biblical references. The argument follows:
May it please the Court, ladies and gentlemen of the jury. An eye for an eye, a tooth for a tooth or turn the other cheek, walk the additional mile. Which standard, which criterion shall you use? I don't believe any assistant district attorney would attempt to presume to tell you which standard or which criterion to use. I can only call to mind from nearly 2,000 years ago when they took a man, stripped him, beat him, crowned him with thorns, pierced his side, nailed him to a cross and his mother and relatives were at the foot of the cross he didn't say, "Send these people to the electric chair, consign them to hell." He lifted his eyes up and he said, "Father, forgive them for they know not what they do." Which standard, which criterion? The choice is yours.
It should be noted that brevity of the closing argument alone does not prove ineffective assistance of counsel. Entirely satisfactory representation may include a brief closing argument intended to focus the jury's attention on a single item of strategy which counsel deems most likely to achieve a favorable verdict. As this closing argument indicates, defense counsel stressed that the jurors had sole responsibility in determining whether Messiah should live or die (i.e. "The choice is yours."). By asking that the jurors choose *189 between the two Biblical standards, defense counsel implied that the jury's decision was either to be merciful"turn the other cheek"and let him live (though in prison) as Jesus Christ would have done, or to sentence Messiah to death by applying the "eye for an eye" standard. No, he did not say "I urge mercy" or "I urge against the eye for an eye, a tooth for a tooth standard", but the clear implication that Jesus would not send his murderers to the electric chair is a certain and unequivocal plea for defendant's life.
And how was that plea delivered? According to the prosecutor (in rebuttal), the plea was delivered with a "voice where if I think that if some of us closed our eyes it almost sounds like God coming to us or at least Charlton Heston in the movies." Besides provoking the above comment, the delivery and content of defense counsel's closing argument prompted the prosecutor to respond by asking the jury to put aside the biblical quotations and apply common sense.
We are simply unable to conclude from this trial record alone that counsel's brief but passionate plea for mercy, without more, is not sufficient to qualify as reasonable under prevailing professional norms, or that it constitutes deficient legal representation as a constitutional matter. Accordingly, we find no merit on this record in the assignment of error alleging ineffective assistance of counsel at the sentencing phase of defendant's trial.
In post-conviction applications asserting denial of constitutional rights, relevant evidence beyond what appears in the trial record is admissible. Thus, should there exist evidence beyond what appears in this record concerning the ineffective assistance of defendant's trial counsel, defendant will be at liberty to present that evidence in connection with any attempt to raise anew, post-conviction, this same constitutional error.

PROPORTIONALITY OF SENTENCE
Finally, we must determine whether the sentence in this case is disproportionate to the penalty imposed in similar cases from the same district. While the United States Supreme Court has now held that proportionality review is neither constitutionally mandated nor required, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), such review is required under this state's statutory scheme. La.Code Crim. Proc.Ann. rule 905.9.1(1)(c) (West 1984). When conducting this review, we consider both the nature of the crime and the defendant.
In the instant case, the sentence review memorandum submitted by the District Attorney lists only 20 cases, including the instant one, in which the juries recommended the death penalty in Orleans Parish. Our research reveals that Orleans Parish juries have recommended the death penalty in 24 cases since January 1, 1976. Sixteen of these, including the Defendant's, have involved homicides committed during the commission of an armed robbery. State v. Hamilton, 478 So.2d 123 (La.1985); State v. James, 431 So.2d 399 (La.1983); State v. Parker, 421 So.2d 834 (La.1982); State v. Jordan, 420 So.2d 420 (La.1982); State v. Marshall, 414 So.2d 684 (La.1982); State v. Brown, 414 So.2d 689 (La.1982); State v. Mattheson, 407 So.2d 1150 (La. 1982); State v. Culberth, 390 So.2d 847 (La.1980); State v. Kyles, 513 So.2d 265 (La.1987); State v. Thompson, 516 So.2d 349 (La.1987); State v. Brown, 514 So.2d 99 (La.1987); State v. Sullivan, 504 So.2d 876 (La.1987); State v. Johnson, No. 309-852, State v. Cage, No. 313-962; State v. Smith, No. 311-353. Four of these cases, like the defendant's, were single-shot armed robbery cases. Also, in cases arising outside of Orleans Parish, this Court has consistently affirmed the death penalty in other single-shot armed robbery cases. State v. Busby, 464 So.2d 262 (La.1985); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Lindsey, 404 So.2d 466 (La.1981), cert. denied, 464 U.S. 908, 104 S.Ct. 261, 78 L.Ed.2d 246 (1983). Two of these cases involved offenders the same age or younger *190 than Messiah at the time of the crime. Considering the comparison of the instant crime and this defendant to the offenses and defendants in other first degree murder prosecutions in Orleans Parish, we find that the death sentence is not disproportionate.

DECREE
For the reasons assigned, defendant's sentence is affirmed except that this judgment shall not serve as a condition precedent to execution as provided by La.R.S. 15:567 until:
(a) defendant fails to petition the United States Supreme Court timely for certiorari;
(b) that court denies his petition for certiorari;
(c) having filed for and been denied certiorari, defendant fails to petition the United States Supreme Court timely under their prevailing Rules for rehearing of denial of certiorari; or
(d) that court denies his application for rehearing.
AFFIRMED.
DIXON, C.J., dissents from the sentence review with reasons.
DENNIS, J., dissents with reasons.
LEMMON, J., subscribes to the opinion and assigns additional concurring reasons.
LEMMON, Justice, subscribing to the opinion and assigning additional reasons.
One problem that confronts prosecutors, trial judges and appellate courts in claims of ineffective assistance of counsel is the possibility that an unscrupulous defense attorney could deliberately "lie down" and create reversible error. Because of this consideration, and because trial strategy is often not apparent, it is extremely important that trial judges meticulously "make a record" when possible substandard performance occurs, especially in the sentencing phase of a capital case. By determining the attorney's reasons for certain actions or inactions (such as failure to present evidence or to make extensive argument) on the record outside the presence of the jury (and perhaps outside the presence of the prosecutor, if necessary), trial judges can better insure that strategic decisions are not later viewed as lapses of performance that constitute ineffective assistance.
DIXON, Chief Justice (dissenting in penalty phase only).
In his sixth assignment of error Messiah asserts that he had ineffective assistance of counsel at the penalty phase of his bifurcated trial. An accused has a constitutional right to assistance of counsel. United States Constitution, Sixth Amendment; Louisiana Constitution of 1974, Article 1, § 13. The United States Supreme Court has interpreted this right to be the right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984).
In Strickland, the United States Supreme Court adopted a two-part test for determining when counsel's assistance was so defective as to require a reversal of a death sentence: the defendant must show that counsel's performance was defective and that counsel's deficiencies prejudiced the defendant.
In the opening statement of the penalty phase, the prosecutor told the jury that the state would rely on three aggravating circumstances: that the murder occurred during the perpetration of an armed robbery; that the offense was especially heinous, atrocious or cruel; that the defendant had a prior criminal history.
In his opening statement defense counsel then told the jury that if there was a lack of unanimity as to life or death, then the judge must impose life. He then stated that in order to consider death, the jury must find at least one aggravating circumstance and that the jury must also look to mitigating circumstances. He also cautioned the jury that a finding of aggravating circumstances would not necessarily mean death. Defense counsel then stated that the defendant would rely on the stipulation *191 that he was relatively young when the crime was committed.
As evidence, the state introduced all the testimony and exhibits from the guilt phase as well as bills of information from three crimes for which the defendant had been convicted.
For his part, defense counsel only offered the stipulation that Messiah was twenty-five years old at the time of the commission of the offense.
Both sides made closing arguments. The state reminded the jury of the aggravating circumstances on which the state was relying. The prosecutor argued that by virtue of the jury's guilty verdict, it had already determined that the murder occurred during the commission of an armed robbery. The prosecutor then argued as follows:
"What the State would ask is that you go back to consider the sentence in this particular caseyou have already made a determination that a first-degree murder was committed. You made a determination that at the moment he pulled the trigger he meant to kill the lady and at the time he did it he was involved in the perpetration of an armed robbery. You have made that determination. Now, it's necessary to consider the penalty. It requires a unanimous verdict. We would ask that when you consider the penalty, consider what he has done in his lifetime up until now. Consider two convictions for having a firearm on his person. Consider the possession of stolen property conviction and consider the cold-blooded manner in which this woman died and the instantaneous way, how fast he made that decision to take her life, just like that. It happened so quickly and she is gone because of certain decisions that he made. He has made those decisions throughout his whole life. He decided to carry the gun back when he was convicted and he decided to carry the other gun with the obliterated serial number and he decided to be in possession of stolen property. He has charted his own course which has brought himself here. It brought him on February 15th to that Popeye's on Mardi Gras Day and it brought him to kill Bernice Holman and to terrorize all these other people.
Consider the nature of the crime and you will find when you go back that it's time to send a message to this man that you are not going to tolerate what he has done and that the appropriate penalty in this particular case would be a recommendation of death."
Defense counsel then made the following closing argument, quoted here in its entirety:
"An eye for an eye, a tooth for a tooth or turn the other cheek, walk the additional mile. Which standard, which criterion shall you use? I certainly wouldn't attempt to presume to tell you. I don't believe any assistant district attorney would attempt to presume to tell you which standard or which criterion to use. I can only call to mind from nearly 2,000 years ago when they took a man, stripped him, beat him, crowned him with thorns, pierced his side, nailed him to a cross and his mother and his relatives were at the foot of the cross and he didn't say, `Send these people to the electric chair, consign them to hell'. He lifted his eyes up and he said, `Father, forgive them for they know not what they do'.
Which standard, which criterion? The choice is yours."
The standard for measuring attorney performance is reasonableness under prevailing professional norms. Strickland, supra 104 S.Ct. at 2065. In a criminal proceeding, a defense counsel has several duties, including the duty to advocate the defendant's cause. In the penalty phase of a capital proceeding, the "cause" is the defendant's life. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L. Rev. 299 (1983). In addition, defense counsel has the duty to use his/her skill and knowledge to ensure that the trial is a reliable adversarial testing process. Strickland, supra at 2065.
In the penalty phase here, the only evidence for mitigation that counsel offered was an age stipulation. Standing alone, *192 the paucity of mitigating evidence offered by defense counsel does not necessarily render counsel's performance deficient; it may be a reasonable strategy to present little evidence.
However, when virtually nothing is offered in mitigation, defense counsel's opportunity to act as an advocate for defendant's life lay in the closing argument. "At the penalty phase of a capital case, the central issue is no longer a factual inquiry into whether the defendant committed any crimes; it is the highly-charged and emotional issue of whether the defendant, notwithstanding his crimes, is a person who should continue to live." Goodpaster, supra at 334.
In his closing argument, defense counsel did not act as an advocate. He failed to argue any of several possible points that would encourage a juror to vote for life. He made no reference to the one mitigating factor on which he told the jury he was relyingMessiah's youth. He did not attempt to invoke any residual doubt in the jurors' minds about specific intent. Nor did he argue that the crime was not especially heinous, atrocious or cruel. He did not argue that the previous convictions were not crimes of violence against persons. He made no effort to humanize the defendant. He did not even directly ask the jury to spare Messiah's life.
The second part of the Strickland test requires a showing of prejudice. The standard for prejudice is "reasonable probability"a probability sufficient to undermine confidence in the outcome.
"... When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencerincluding an appellate court, to the extent it independently reweighs the evidence would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Strickland v. Washington, supra 104 S.Ct. at 2069.
As discussed above, counsel's closing failed to argue any of the several points favorable to his client. Beyond that, however, the content of the Biblically-styled closing argument was adverse to Messiah's cause in several respects.
First, counsel inaccurately stated that "an assistant district attorney would [not] attempt to presume to tell you which standard... [eye for eye or turn the other cheek] to use." In a case in which the state seeks the death penalty, the prosecutor certainly does attempt to tell the jury that the "eye for eye" standard is appropriate, albeit not necessarily in Biblical terms. Moreover, counsel stated that he would not presume to tell the jury which standard to apply. By refusing to suggest that the "turn the other cheek" standard was the appropriate one, counsel abdicated his role as an advocate.
Second, the analogy to Jesus is obscure. On one hand, the reference suggests that the victim was the Jesus-figure and would have forgiven the defendant. Not only is there no basis for that, but in the criminal justice system, it is the jury, not the victim, who decides the penalty.
The analogy could also refer to the defendant as the Jesus-figure. That interpretation implies that the defendant would forgive the jury for sentencing him to death; such a suggestion undermines the defendant's cause.
Third, the Biblical quotation of forgiveness"forgive them ... for they know not what they do"is an unclear reference and hurts the defendant's cause. If the word "them" refers to the defendant, there was indication in the trial that Messiah did not know what he was doing when he committed the crime. In the face of the evidence elicited during the guilt phase, this invocation is unfounded. If the word "them" refers to the jurors, then the implication is that the jury is not responsible for the fate of Messiah. Under either interpretation, counsel's plea was unfounded.
Literary or Biblical exhortations may be effectively used to persuade a jury that the death sentence is inappropriate in a particular case. However, when the analogies are inaccurately stated or inappropriately drawn, they can have the opposite effect.
*193 The closing argument here did not constitute an appeal for life.
After the jurors retired to deliberate during the penalty stage, they returned and asked the judge the following questions:
"A JUROR: Sir, the jurors would like to know if the suspect is sentenced to life imprisonment is there a possibility that he can be pardoned by the Governor?
Does the same apply to the death penalty or can someone get out?
I have one other question. Of course, this is idealistic, but if he is given life imprisonment, will he have the benefit of rehabilitation where he could do something functional behind bars? I know he will never be in society.
Judge, do you know by chance how the Governor gets the power to pardon people?
With the life sentence that means that he will be in jail until he dies?"
Some jurors were, without a doubt, considering life imprisonment as an appropriate punishment. Those jurors were given no reason to spare defendant's life, nor were they asked to do so.
Under these circumstances, we should hold that there is a reasonable probability that the outcome of the sentencing phase would have been different but for the ineffective assistance to which defendant was constitutionally entitled.
DENNIS, Justice, concurring in part and dissenting in part.
I respectfully concur in the affirmance of the conviction but dissent from the holding that the defendant was afforded effective assistance of counsel in the penalty hearing.
Despite all of the striving of the majority opinion, the empty rhetoric of the defense counsel's closing statement is not an acceptable substitute for a reasoned argument demonstrating how the evidence, the law and the judge's instructions might be viewed together in favor of a life sentence for the defendant instead of a death penalty. Even if one assumes, as the majority, that defense counsel intentionally gambled defendant's destiny on the slender hope that a biblical filagree added to this murder story might strike a chord of mercy within a juror's heart, counsel's histrionic was patently deficient in this case in which the defense failed to present any clearly mitigating evidence. In truth, defense counsel abandoned his client's rights and his own duty as an advocate when he relied on such an insubstantial closing and failed either to ask for the defendant's life or to argue meaningful points such as the defendant's youth, his previous non-violent record, and others pointed out by the Chief Justice. In doing so, defense counsel deliberately forfeited the defendant's only opportunity to use the law and the skills of advocacy to persuade the jury to exercise its discretion within legal channels toward a sentence of life at hard labor rather than death by electrocution.
NOTES
[1] The fifth eyewitness, Eddie Hager, refused to assist the police in their investigation and would not participate in the photographic identification.
[2] The "significant prior history of criminal activity" aggravating circumstances was declared unconstitutional in State v. David, 468 So.2d 1126 (La.1985).
[3] Dixon, Chief Justice and Dennis, J., are in the minority concerning this Court's review of the penalty phase of defendant's trial. See the Chief Justice's dissent from the majority's finding of no reversible error in the penalty phase, following.
[4] Dixon, C.J., and Dennis, J., dissents with reasons.
[5] Concerning the guilt phase, however, we do here note the following. The record indicates that the "reasonable doubt" instruction in the guilt phase of the defendant's trial arguably raises a close question under State v. McDaniel, 410 So.2d 754 (La.1982) and U.S. v. Alvero, 470 F.2d 981 (5th Cir.1972). Although not assigned as error, the instruction included, among repetitious fully correct references to the definition of reasonable doubt, the phrases "grave uncertainty" and "moral certainty" which might be found to overstate the degree of certainty required by the reasonable doubt standard under the rationale of McDaniel and Alvero, supra. This issue is not treated more extensively in these opinions, for among other reasons, it was not assigned as error. Nonetheless, we do make the following determination. We are not prepared to say that the use of these phrases, in the context of the whole charge, would have caused a reasonable person of ordinary intelligence difficulty in understanding the definition of "reasonable doubt." Note the similar conclusion in State v. Taylor, 410 So.2d 224 (La.1982). As did the federal court of appeals in U.S. v. Indorato, 628 F.2d 711 (1st Cir.1980), we too discourage the use of such phrases as "grave uncertainty" and "moral uncertainty" in the reasonable doubt jury charge, but we do not regard their use, in the context of the full charge given in this case, as reaching the level of legal or constitutional error.
[6] Defense counsel in Myles erroneously failed to object the the prosecutor's argument which implied that the death penalty should be imposed because "a true life sentence is an illusion" and he specifically conceded Myles' commission of armed robbery as an aggravating circumstance in his closing argument. Also, defense counsel in Myles failed to object to erroneous jury instructions during the sentencing hearing or to request additional instructions. Other noted omissions in Myles were defense counsel's waiver of his client's right to make an opening statement and his failure to introduce evidence during the sentencing phase.